(No. 19220.—)

EUNICE R. HAHN, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(THE YELLOW SLEEVE VALVE ENGINE WORKS, INC., Defendant in Error.)

*Opinion filed October 19, 1929—Rehearing denied Dec. 7, 1929.*

FRANCIS C. KING, and WOOD & WARNER, for plaintiff in error.

JOHN A. BLOOMINGSTON, and HUBER & REIDY, for defendant in error.

Mr. COMMISSIONER PARTLOW reported this opinion:

Plaintiff in error, Eunice R. Hahn, filed a petition with the Industrial Commission against defendant in error, the Yellow Sleeve Valve Engine Works, Inc., of East Moline, Illinois, for compensation on account of the death of her husband, Clyde C. Hahn, on January 4, 1925. The arbitrator found that she was not entitled to compensation because the death was not the result of the injury sustained. A petition for review by the Industrial Commission was filed. On March 25, 1926, the body of the deceased was exhumed, an autopsy was held, additional evidence was taken on both sides, and on April 29, 1927, the Industrial Commission affirmed the finding of the arbitrator. The case was reviewed by the circuit court of Rock Island county upon a writ of *certiorari,* the decision of the Industrial Commission was confirmed, and the case is before this court upon a writ of error.

The deceased, who was a pipe-fitter, was employed by defendant in error for nineteen days. In the factory of defendant in error pipes containing electric wires extended down a wooden post or pillar to electric switches. On January 4, 1925, the deceased placed a step-ladder five feet four

inches tall just north of this post. The feet of the ladder extended east and west. A few feet east of the post was a lathe, which had a guard rail around it about three feet high. The deceased was standing on top of the ladder, facing the post. He had a chisel in one hand and a hammer in the other, and with both hands above his head he was cutting a groove in the post in which to place a wire. He fell from the ladder, struck the guard rail around the lathe, and his body landed on the floor between the post and the lathe. The ladder fell to the north. There was a scalp wound in his head about one inch long, from which some blood flowed. He was carried into the hall entrance, where he died in a minute or two.

It is the contention of defendant in error that the deceased did not fall from the ladder as the result of an accident or on account of anything which he did in the prosecution of his work, but that he died from natural causes and fell because he was struck by death while working. The contention of plaintiff in error is that while prying with the chisel he exerted enough force to tip the ladder; that his death was the result of the fall, or at least the fall hastened his death; that he breathed after he fell, his heart beat and he bled from the wound in his head, all of which indicated that he did not die from heart failure.

There is evidence tending to show that the deceased was prying with his chisel and that the prying forced the ladder from under him, but it is questionable how much weight should be given to this evidence. Other witnesses who had equal opportunity to see what happened testified that they could not say what caused him to fall. It is undisputed that when he fell he did not utter a sound and made no effort to catch himself or to break his fall. Some of the witnesses testified that he fell in a lump; that he went back straight; that he fell in a standing position; that he made a quarter turn; that he fell in a helpless condition, all crumpled up; that he appeared to be either dazed or un-

conscious; that he did not seem to be falling on account of a slip but seemed to be toppling over as if he did not know he was falling. There is evidence that he bled from the wound in his head after he fell, that he breathed or gasped several times, that his heart beat and that he opened his eyes. There is evidence that when persons fall as the result of accident they generally make an outcry and attempt to save themselves. Dr. Bendixen, who was called by plaintiff in error, testified that he examined the deceased at the time he was employed; that he had an aggravated rupture at the site of an old appendix operation; that he had absorbed considerable pus, which would tend to cause heart lesion; that he died of a dilated heart; that he could have breathed after the dilation occurred; that the nerves would still keep up stimulation as a breathing center and his heart could stop and he might continue to breathe for several minutes. Dr. Hardinger, who reached deceased just a few minutes after he died, testified that he died of acute dilation of the heart; that he was dead before he struck the floor; that he could breathe after the dilation; that acute dilation of the heart is one of the causes of spontaneous death; that the time within which the heart would stop beating would depend upon the extent of the lesion; and that when a man dies of heart trouble he usually collapses. All of this evidence was taken by the arbitrator and was the basis of his finding.

Fourteen months after the deceased was buried his body was exhumed through the efforts of plaintiff in error. Two doctors performed an autopsy, and both testified on behalf of plaintiff in error. Their testimony was that most of the organs of the body were normal and that the cut in the head was not sufficient to produce death. Dr. Bollaert testified that the thymus gland was found to be enormously enlarged; that normal adults have no thymus gland or it is merely rudimentary; that it usually recedes to such an extent that there is nothing left of it but some fiber or

connecting tissue, which would only weigh about half an ounce; that the thymus gland in the deceased was twelve inches or more in length, about one and one-half inch wide and about one and a quarter inch thick at its base, and it had two lobes, which made the base. One of these lobes was four inches wide and one and a half inch thick. There was an accessory lobe in connection with the main lobe about the size of a man's tongue; that this thymus gland would weigh about a pound and a half or two pounds; that such a thymus gland would predispose the individual to sudden death from shock; that in his judgment the deceased died from shock, caused by the laceration in the head; that he might have been dead before he hit the floor but that the scalp laceration was caused before death; and that he died of shock superimposed on a condition of status lymphaticus. Dr. Lamb, the physician who aided in the autopsy, testified that they found a mass of tissue that extended from the manubrial notch down in front of that part of the chest known as the breast bone, between the edges of the lungs. They found that one lobe of this mass was attached to the costal margin just below the border of the liver; that the other lobe went down to about the seventh rib on the left side; that they dissected the mass and found that it was continuous with and a part of the thymus gland. The longest measurement of the mass was twelve and three-quarters inches and the shortest measurement was eight and a fraction inches; that in the center it was about two and a half inches wide and one inch thick, and at the top it was one and three-quarters inch wide and seven-eighths of an inch thick; that it would weigh a pound and a half; that in his opinion the deceased died as a result of shock superimposed on a body that had an excessively large thymus gland, and that the thymus gland was associated with the death from shock.

Dr. Bendixen was called by defendant in error, and in response to a hypothetical question put to him embracing

the testimony of the two doctors who performed the autopsy, testified that the deceased was dead before he struck the floor; that he died from an enlarged thymus gland, which would have action on his heart; that he died of status lymphaticus; that the thymus gland was a predisposing cause and that the fall did not contribute to his death. He testified that the natural tendency of persons falling is to attempt to save themselves, which in this case was not done, and that the thymus gland is associated with death by shock. Dr. Stevens testified that in his judgment the laceration in the head did not have anything to do with the death; that status lymphaticus causes sudden death; that if the muscles had been rigid and if the deceased had attempted to save himself it would have caused some injury; that he died of status lymphaticus; that the testimony of the two physicians who performed the autopsy was that they found changes in the heart muscles,—a degeneration of some sort,—but it was his heart that killed him; and that the heart killed him regardless of other conditions.

The burden of proof was upon the plaintiff in error to prove by the preponderance of the evidence that the death was the result of an accident which occurred in the course of the employment. The same rules govern the admission of evidence and the burden of proof before the Industrial Commission as are applied in courts of law. (*Inland Rubber Co. v. Industrial Com.* 309 Ill. 43.) The findings of the commission on the facts will not be disturbed by this court unless such findings are against the manifest weight of the evidence. (*County of Cook v. Industrial Com.* 327 Ill. 79.) If a workman dies from a pre-existing disease which is accelerated under circumstances which can be said to be accidental his death is the result of accidental injury. (*Chicago and Alton Railroad Co. v. Industrial Com.* 310 Ill. 502.) The liability of an employer under the Compensation act cannot be based on a choice between two views

equally compatible with the evidence but the liability must be based upon facts established by the evidence, and where the cause of the injury or death is equally consistent with an accident and with no accident, compensation will be denied. *Ryan* v. *Industrial Com.* 329 Ill. 209.

The arbitrator, the Industrial Commission and the circuit court each found that this death was not the result of the accident. When the evidence is considered in its entirety we cannot say that such findings are contrary to the manifest weight of the evidence, and the judgment will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*