# Richmond

## Louella Bailey v. Stonega Coke and Coal Co.

November 25, 1946.

Record No. 3105.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Fred B. Greear*, for the appellant.

*J. L. Camblos* and *A. H. Sandt*, for the appellee.

Holt, C. J., delivered the opinion of the court.

The deceased, Wilburn C. Bailey, was a man thirty-nine years of age, about six feet tall and weighed around one hundred seventy pounds. He had been employed as a coal miner for many years. Much of this time he had worked for the defendant, although in intervening years he had worked for other coal companies; but he returned to the Stonega Coke and Coal Company, had worked at its mine known as the Imboden Mine for the past twenty-two months and was working there on the night shift at the time of his death on June 10, 1944. He and petitioner,

Louella Bailey, had been married for eleven years and had five children. His average weekly wage was $42.37.

Until the date of his death, his health seemed excellent. The first intimation that this might not be the case occurred just before he was stricken. He had been loading a mine car with coal when he quit, put away his tools, and said to a fellow-workman that he was not well. There was an autopsy. The coroner and two examining physicians returned this report:

" * * * The chest contents were thoroughly exposed by dissecting the ribs and inverting a large flap. The lungs looked normal with the exception of pigmentation usually found in miners.

"Right side of heart acutely *dialated* and contained about one pint of blood. This *dialiation* was confined to the right auricle which was at least five times its normal volume. The enlargement of the right side of the heart was so extensive before opening the heart it stimulated a large custic tumor of the wall of the right auricle.

"Death in our opinion was due to acute *dialitation* of the heart centering in the right auricle and was evidently practically instantaneous.

"Coroner and associate doctors signatures below.

N. F. Hix, Coroner.

C. B. Bowyer

T. J. Tudor."

Dr. C B. Bowyer, a witness introduced on behalf of the petitioner and who had been for the preceding year president of the Medical Society of Virginia, said:

"That is my opinion, that this man had this congenital thing, it gradually got worse, coincidental with work, with natural causes. If it had not been that day it might have been the next on the way home."

Dr. Thomas J. Tudor, another witness for the petitioner, said that "The auricle ordinarily holds no more than four ounces of that size, that would be one-fourth, it was dilated some beyond that. Figured five times beyond normal, about amount of twenty ounces, as had been

enough to stretch it tight. Would have been sac containing twenty ounces, whereas heretofore would contain about four ounces," and that this dilation was "About as big as I ever saw." Again: "The most probable cause of that weakened condition (congenital) of the wall of the auricle was that it was present, had it all his life and heart had accommodated it and carried on; and finally it just got to point it failed. * * * "

Dr. Bowyer also said:

"Well, from what we have found, the condition of the heart, in my opinion the man has congenital condition to start with He died from natural causes, just what part his work played, I am unable to say."

Dr. N. F. Hix, who was also coroner, answering a hypothetical question by petitioner's counsel, said, assuming all of the facts there stated are to be proven, "I think that would cause it, over-exertion. I think it would be more apt to occur from over-exertion than not doing anything."

On cross-examination he was asked: "If loading coal was his regular occupation, you would not say that it was over-exertion?" He answered: "I don't know whether over-exertion or not. I feel if he was over-exerted he would be more apt to have that."

When coal mines are opened not all of the coal in sight is usually then taken, else the roof might fall in; but pillars for support are left, which are themselves afterwards cut away to the extent that seems to be safe. In this instance one was left 100 feet wide and 150 feet long. By its side ran a railway track. At the time of Bailey's death about 70 feet of this pillar had already been cut away.

The floor of this mine, along which the railway ran, was not level but went up and down in various places and to this extent: The top of a coal car at grade was 32 3/16 inches as it stood from the floor, and it stood from the floor 46 3/16 inches at the utmost point of depression—that is to say, the top side of the car to one standing on the ground was a foot higher in one instance than in the other. It is the contention of the petitioner

that Bailey stood on the lower level and that the strain of loading coal was greater in that instance than it would otherwise have been, and that the extra labor thus entailed brought an accident which otherwise probably would not have happened. The defendant, in answer to this claim, said that this physical situation might have existed at some point along the railway track, but that as a matter of fact the floor was level where this car stood when Bailey was shoveling coal into it; that heart failure at this particular moment was due to a congenital heart disease that might have occurred at any moment, and that such dilations of a healthy heart which would have followed the exertion incident to the loading of a car under normal conditions would have readjusted themselves in due course.

This case was first heard by Commissioner Deans. His opinion, written into the record, contains a comprehensive review of relevant testimony. He held that the evidence failed to establish that there was any working condition of an unusual or extraordinary nature such as would produce strain or exertion to account for the death and that it was only necessary to lift the coal 32 3/16 inches to clear the top of the coal car.

"The autopsy disclosed an enlarged heart, the walls of the right auricle were weakened so that there was approximately five times as much blood in this cavity as would normally be. The walls of the right auricle were distended but not ruptured indicating a congenital condition, or a condition of long standing. Ordinarily exertion places a burden on the ventricles of the heart which are ordinarily able to compensate for the additional strain in pumping the blood away from the heart. The auricles, however, receive the blood after that has passed through the body, pumping only a short distance into the ventricle, so that there is normally no strain on the auricle. It could not be determined by the autopsy as to whether the valves of the right auricle were non-functioning so as to account for the distension of the auricle, causing the blockage of the blood to the auricle, or whether there was just an accumulation of

blood five times above normal in the auricle because of the weakened condition of the walls of this part of the heart. There was no evidence of poison gases or lack of proper air ventilation, so that the only conclusion that can be reached is that death was due to heart failure having no connection with the employment but coincidental therewith. If it were assumed that there was a depression of 12 inches below the normal level of the floor, between the front of the coal car and the face of the coal, making it necessary to raise a shovel of coal 44 3/16 inches for clearance above the top of the car, rather than 32 3/16 inches as normally, a reasonable conclusion would be that the loader would not place as much coal on the shovel as he would heave it into the car.

"The evidence fails to establish any abnormal working condition such as would produce a strain or exertion out of the ordinary for a miner. The claimants have the burden of establishing an accident and an injury or death resulting therefrom. As the claimants have failed to establish an accident arising out of and in the course of the employment to account for the death, compensation benefits are denied and the claim removed from the docket and the file closed."

The case came on afterwards to be heard by a full Commission, which unanimously adopted and approved of the findings and conclusions made by Commissioner Deans.

Sec. 2-d of the Virginia Workmen's Compensation Act provides:

" 'Injury' and 'personal injury' mean only injury by accident, or occupational disease as hereinafter defined, arising out of and in the course of the employment and do not include a disease in any form, except when it results naturally and unavoidably from either of the foregoing causes." Code, 1942 (Michie), 1946 Supp., section 1887 (2d).

Here the injury sustained arose during the course of employment but the Commission held that it was not a result naturally and unavoidably incident thereto.

In *Burlington Mills Corp.* v *Hagood*, 177 Va. 204, 13 S. E. (2d) 291, this court quoted with approval this statement

of the law from *Wilson & Co.* v. *Mathews,* 170 Va. 164, 195 S. E. 490:

"The Compensation Act is intended to be remedial and must be liberally construed in favor of the employee."

But statutory prerequisite requirements still obtain.

In *Turner* v. *Virginia Fireworks Co.,* 149 Va. 371, 141 S. E. 142, this court said:

"The findings of fact by the Commission, when supported by evidence, are binding upon this court. We cannot consider any other evidence in conflict therewith," citing *Stonega Coke, etc., Co.* v. *Sutherland,* 136 Va. 489, 118 S. E. 133.

On conflicts of evidence the situation is somewhat analogous to a jury's verdict sustained by the trial court.

In *Bradshaw* v. *Aronovitch,* 170 Va. 329, 196 S. E. 684, this court cited with approval from *In re McNicol,* 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306, the proposition that there must be causal connection between the employment and the accident. The burden of showing this rests upon the petitioner. *Sullivan* v. *Suffolk Peanut Co.,* 171 Va. 439, 199 S. E. 504, 120 A. L. R. 677.

In *Campbell & Co.* v. *Messenger,* 171 Va. 374, 199 S. E. 511, we said:

" 'When damages are claimed for injuries which may have resulted from one of two causes, for one of which the defendant is responsible, and for the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damage was produced by the former cause. And he must also fail if it is just as probable that the damages were caused by the one as by the other, since the plaintiff is bound to make out his case by the preponderance of evidence.' *Norfolk, etc., Ry. Co.* v. *Poole,* 100 Va. 148, 40 S. E. 627; *Pearcey* v. *St. Paul Fire, etc., Ins. Co.,* 163 Va. 928, 177 S. E. 843. This principle is as applicable to Workmen's Compensation cases as it is to other cases. *Hahn* v. *Industrial Comm.,* 337 Ill. 59, 168 N. E. 652."

This principle we applied in *Crews* v. *Moseley Bros.,* 148 Va. 125, 138 S. E. 494. There petitioner was engaged in

digging a ditch. The ditch was unusually deep and work in it was "pretty hot." Petitioner was stricken with apoplexy and died. We said:

"While it is always the endeavor of the courts to construe the compensation statute liberally, in order to carry out its beneficent purpose, it must not be overlooked that liability cannot rest upon imagination, speculation, or conjecture, but must be based upon facts established by the evidence and so found by the Commission," citing *United States Fuel Co.* v. *Industrial Comm.,* 310 Ill. 85, 141 N. E. 401.

We further said:

"The mere fact that Robertson died of apoplexy is in no sense indicative of an accident. There must be shown a causal connection between the disease and the accident suffered. This burden the claimant has failed to carry."

Apoplexy may have been brought on by the fact that Robertson was working in a ditch unusually deep and by weather conditions. It may have been due to causes not attributable to these circumstances, just as here heart conditions might have brought death at any moment; and we cannot say that shoveling coal into a car as coal is ordinarily shoveled by one who stood upon level ground, and where the car stood upon level ground, whose side was 32 3/16 inches from the ground, caused him to be stricken because of what he was then doing.

In *Byrd* v. *Stonega Coke, etc., Co.,* 182 Va. 212, 28 S. E. (2d) 725, it appears that Byrd died suddenly from a heart attack while at work. He was a healthy man with a healthy heart. When stricken he was drawing coke from the ovens and breaking it up for shipment. The temperature in these ovens from which this man was drawing coke was something more than 2400 degrees Fahrenheit. The day itself, July 31st, was extraordinarily hot and sultry. Byrd had a healthy heart; Bailey's heart was diseased.

Mr. Justice Hudgins, speaking for the court, in the course of his opinion said:

"The employee in the instant case was apparently enjoying the best of health. Neither his wife nor intimate friends had ever heard him complain of any physical ailment except during the one attack of influenza which occurred five months prior to his death. While performing his duties under conditions that exposed him to artificial heat to a much greater degree than he otherwise would have been exposed, he suddenly collapsed and died. The natural inference from these conceded facts is that the extreme heat to which the employee was exposed was the proximate or contributing cause of death. This is true because it is a matter of common knowledge that frequently persons apparently normal collapse from exposure to extreme heat or cold. Hence, when facts, such as heretofore stated, are established, a claimant should be held to have made out a *prima facie* case for compensation."

It is conceded that conditions were extra hazardous.

That opinion ends with this statement:

"The excessive heat to which decedent was exposed is a controlling factor in the case, and cannot be ignored."

This court was there of opinion that causal connection had been shown, and that petitioner should recover.

Something was said about the stratum of coal in this pillar being tight due to pressure. When this is the case ordinarily the practice is to "shoot it out." Already 70 feet of this pillar had been cut away without trouble, and, as we have seen, Commissioner Deans said:

"The evidence fails to establish any abnormal working condition such as would produce a strain or exertion out of the ordinary for a miner."

Plainly this diseased condition of Bailey's heart did not develop in a day. Its antecedent condition had long existed and might have at any moment and under normal conditions reached a crisis with fatal results.

We find no error in the findings of the Commission. In each instance there is evidence to support it.

*Affirmed.*