# Richmond

## Panther Coal Company, Inc. v. Charley L. Looney.

November 25, 1946.

Record No. 3111.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston and Buchanan, JJ.

The opinion states the case.

*H. Claude Pobst, Marjorie Coleman* and *Joseph M. Sanders,* for the plaintiff in error.

*S. H. & Geo. C. Sutherland,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Charley L. Looney, plaintiff, brought his motion for judgment against Panther Coal Company, Inc., defendant, claiming damages on account of pollution of a small stream, called Enoch's branch, and two wells, referred to as the Looney well and the Shortridge well, on the plaintiff's land, which he claims resulted from the defendant's turning mine water into the branch. The jury returned a verdict for the plaintiff for $1,500 on which the trial court entered judgment, and to that judgment this writ of error was awarded the defendant below.

The lands of the parties adjoin. The plaintiff, who is a farmer and sawmill operator, is the lower and the defendant is the upper riparian owner. The plaintiff's farm comprises about 150 acres, of which 35 to 40 acres are level and the rest mountainous. The defendant is engaged in coal mining and has under lease for this purpose about 10,000 acres of land. There are several openings made in the mountains for taking out the coal, and the water that accumulates in the mines runs through some of these openings into the creeks and branches, some fourteen of them, that drain the lands in the defendant's leases. It is 50 or 60 miles around the coal outcrop on the leaseholds.

Enoch's branch rises on the defendant's land, flows south through the plaintiff's land and empties into Slate creek, a short distance below plaintiff's house. It goes practically dry in the summer and fall and the water then stands in it in pools. This is shown by the evidence, and more clearly by four pictures filed as original exhibits. In the spring of 1941 the defendant made an opening from its mine workings to the outside, not far below the head of Enoch's branch and about two miles above the plaintiff's property. From this opening the water that gathered naturally in the mine workings by seeping and percolating from the overlying strata and from beneath the coal seam, flowed naturally down the side of the mountain over defendant's land and into Enoch's branch on defendant's land. This mine water contained acids and minerals, sufficient at least to discolor the ground, and injure or kill vegetation on its way down

over defendant's land to the branch. There was evidence that it colored the rocks to some degree in the branch all the way along, but did not injure vegetation along the banks.

Plaintiff first complained to the defendant about this mine water in Enoch's branch in June, 1944. The defendant thereupon built or dug three settling pools or basins on the side of the mountain below the opening at substantial cost. The water that came from the mine flowed first into the upper of these pools, then the overflow went into the next lower down and from that into the third, and from the third on down into the branch as described. The purpose of this was to have the minerals in the water settle in these basins so that the water that ran from the third pool into the branch would have less acids and minerals in it.

The result accomplished did not satisfy the plaintiff and he brought suit by notice dated September 20, 1944. In this notice he alleges that the mine water polluted the water of the branch which before was clear, pure and wholesome. In his bill of particulars and in his evidence he claimed damages because the polluted waters injured his sawmill boiler and the two wells on his premises above referred to. The trial began July 16, 1945, and at the conclusion of the evidence the jury viewed the plaintiff's premises, but not the place where the mine water came into the branch, which was not easily accessible, and then returned their verdict for the plaintiff upon which the court afterwards entered the judgment to which this writ of error was awarded.

There are three assignments of error. The first two are to the action of the court in refusing to strike the plaintiff's evidence, and in refusing to set aside the verdict and enter judgment for the defendant, on the ground that the evidence for the plaintiff is not sufficient. The third is to the court's refusal to set aside the verdict and grant the defendant a new trial for errors alleged to have been commited in granting and refusing instructions and admitting and rejecting testimony. In the argument before us defend-

ant's counsel waived all assignments of error that do not go to the merits of the case, which makes it unnecessary to consider the third assignment.

The defendant contends, first, that it had the legal right to let water from its mine run into Enoch's branch even though that branch and the plaintiff's wells were polluted thereby. This on the ground that Enoch's branch is the natural drainage from this mine; that the defendant did nothing to alter the quality of the water; that its operations were carried on according to approved mining practices and without negligence, and that coal cannot be mined unless water is permitted to run out of the mine.

For this position it relies on *Pennsylvania Coal Co.* v. *Sanderson*, 113 Pa. St. 126, 6 A. 453, 57 Am. Rep. 445; 56 Am. Rep. 89. Beyond doubt that case supports this contention. There the coal company did more to contaminate the stream involved than did the defendant here, and the result was much more harmful. The Pennsylvania court observed that the defendants there had done nothing to change the character of the water or to diminish its purity other than what resulted from the natural use of their own property; that the water emptied into the brook was the water which the mine naturally discharged, the same as here; that the defendants had the right to mine the coal, as of course they do here; that, as a general proposition, "every man has the right to the natural use and enjoyment of his own property; and if while lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor it is *damnum absque injuria;* for the rightful use of one's own land may cause damage to another, without any legal wrong. Mining in the ordinary and usual form is the natural user of coal lands."

It was held that the plaintiff could not recover, primarily on the ground that: "To encourage the development of the great natural resources of a country trifling inconveniences to particular persons must sometimes give way to the necessities of a great community."

That case has not had a serene life. It was decided by a divided court. Its history is reviewed in *Strobel* v. *Kerr Salt Co.,* 164 N. Y. 303, 58 N. E. 142, 51 L. R. A. 687, where it is said that it was not until it had come before the Pennsylvania court for the fourth time that, influenced by the necessities of a great industry, the rule was laid down as stated; that courts of the highest standing have refused to follow it; and that its doctrine was finally limited by the court which announced it. In the later case of *Pennsylvania R. Co.* v. *Sagamore Coal Co.,* 281 Pa. 233, 126 A. 386, 39 A. L. R. 882, it is said that "the most that could be said of what was accorded to the defendant in that much-controverted case is that it was a privilege." See note to that case in 39 A. L. R., pp. 891, 911; and note in 109 A. L. R., p. 395.

The *Sanderson Case* was first considered by this court in *Trevett* v. *Prison Ass'n,* 98 Va. 332, 36 S. E. 373, 81 Am. St. Rep. 727, 50 L. R. A. 564, where it was distinguished on its facts, and where, in an opinion by Keith, P., it was stated that "we have quoted thus fully from this case, not that we mean to approve, or that we presume to disapprove, the law as stated in that case, but merely to show that it has no very close analogy to the one before us."

It was examined again in *Arminius Chemical Co.* v. *Landrum,* 113 Va. 7, 73 S. E. 459, 38 L. R. A. (N. S.) 272, Ann. Cas. 1913D, 1075, and its holding disapproved in this language:

"That case had been before the Supreme Court of Pennsylvania twice before, when the decision was in favor of the lower riparian owner. On the third appeal the decision relied on was made by a divided court—four judges to three. The conclusion reached on the last appeal is not in accord with principles which have for centuries applied in determining the common interests and rights of riparian proprietors, and the case has received but little approval outside of the jurisdiction in which the ruling was made. That decision, as it seems to us, is based upon two grounds, neither of which is sound—viz., that the rights of one

riparian owner are to be determined by the necessities of another, and by the importance of the latter's business to the community or public."

See also, *Oakwood Smokeless Coal Corp.* v. *Meadows*, 184 Va. 168, 34 S. E. (2d) 392.

In *Shoffner* v. *Sutherland*, 111 Va. 298, 68 S. E. 996, the *Sanderson Case*, is not discussed, but the principle there announced is necessarily disapproved by the following statement: " 'It would,' as was said in *Townsend* v. *Norfolk R., etc., Co.*, 105 Va. 22, at p. 49, 52 S. E. 970, 978, 115 Am. St. Rep. 842, 4 L. R. A. (N. S.) 87, 'be a source of regret if, in the administration of justice by the establishment and enforcement of sound principles the prosperity of our people should be hindered or checked, but it would be not only a source of regret, but of reproach, if material prosperity were stimulated and encouraged by a refusal to give to any citizen a remedy for wrongs he may sustain, even though inflicted by forces which constitute factors in our material development and growth. Courts have no policies, and cannot permit consequences to influence their judgment further than to serve as warnings and incentives to thorough investigation and careful consideration of the causes submitted to them.' "

■ We hold that the defendant did not have the legal right to pollute in a material and substantial way the stream and the wells.

Is there sufficient evidence of material and substantial pollution by the defendant's mine waters to take that question to the jury, and if so, does the fact that the plaintiff himself caused the stream and the wells to be polluted prevent a recovery by him from the defendant?

■ In *Trevett* v. *Prison Ass'n, supra*, is this: "In 1 Wood on Nuisances, (3rd Ed.), section 427, it is said: 'The right of a riparian owner to have the water of a stream come to him in its natural purity is as well recognized as the right to have it flow to his land in its usual flow and volume. But in reference to this, as with the air, it is not every interference with the water that imparts impurities thereto,

that is actionable, but only such as impart to the water such impurities as substantially impair its value for the ordinary purposes of life, and render it measurably unfit for domestic purposes; * * * .'

\*       \*       \*       \*       \*       \*

"It was said by the court in *Merrifield* v. *Worcester*, 110 Mass. 216, 219, 14 Am. Rep. 592: 'Cultivating and fertilizing the lands bordering on the stream, and in which are its sources, their occupation by farmhouses and other erections, will unavoidably cause impurities to be carried into the stream.  As the lands are subdivided, and their occupation and use become multifarious, these causes will be rendered more operative, and their effects more perceptible.  The water may thus be rendered unfit for many uses for which it had before been suitable; but so far as that condition results only from reasonable use of the stream in accordance with the common right, the lower riparian proprietor has no remedy."

In *MacNamara* v. *Taft*, 196 Mass. 597, 83 N. E. 310, 312, 13 L. R. A. (N. S.) 1044, this is said:  "It is only when the owner in the stream below is materially affected in his right to use the water, by reason of its impurity as it enters his premises, that he has a remedy against the upper proprietor by whose use the quality of the water is impaired.  For a slight impairment of quality, necessarily resulting from a reasonable use of the stream or of the land abutting on it, there is no liability.  But the rules and principles so fully stated in *Parker* v. *American Woolen Co.*, *ubi supra* [195 Mass. 591, 81 N. E. 468, 10 L. R. A. (N. S.) 584], forbid the unnecessary discharge of polluting substances into a stream in quantities that appreciably affect the purity of the waters when they reach the premises of a riparian proprietor below, and render them materially less fit for domestic or other uses to which they might be put there than when they came to the land of the owner who is charged with polluting them."

It is entirely clear that the entry of the mine waters into Enoch's branch polluted that branch to some degree.  The

plaintiff had a sample of the water taken from the mine and a sample taken from the Looney well analyzed by a chemist. These samples were taken by Mrs. Looney and it does not satisfactorily appear when or in what manner they were taken. This chemist testified in effect that his analysis showed a very high degree of acid and mineral content in the mine water, and a greatly reduced content of those elements in the well water. He testified that both samples showed more than the usual amount of acid and that the water was unfit for domestic use; that the iron present would make it impossible to turn out a good washing; that tea made from it would turn black, and that "the acidity would not be conducive to good health if used continuously."

The plaintiff's wife testified they had lived on this property for thirty-two years; that the Looney well, which is an open well about 25 feet deep, was there when they went there, and they and their neighbors had used water from it through the years, and that it was good water; that there was something wrong with it now, that it is not like it used to be; that soap will not lather in it; that you cannot wash clothes in it and get them clean; that they first noticed this condition about four years ago, and that it got worse last May, and that she is afraid of it. She testified that before the mine water entered the branch there were minnows and lizards and snakes in the branch, and that she hadn't seen any for the last four years; that the rocks in the branch have turned red, and that livestock will not drink the water from the branch if they can get anything else. The plaintiff testified they had not used water out of the Looney well since some time last June when they discovered this mine water was in there; that they were afraid to drink it; that he didn't know about washing clothes in it, but that you couldn't take a bath in it, that it would roll up on you and stick to you. The plaintiff also testified that the water from the branch corroded his sawmill boiler, that it caused a substance to settle on the crown sheet until everybody became afraid of it and he had to shut down, and that he had to run a pipe line about 1400 feet to a new supply on the mountain.

He introduced samples of the water that came down the branch from the mine when the branch was otherwise dry, of the water out of the boiler, and material raked out of the bottom of the boiler. The plaintiff and his wife were corroborated in some aspects of their testimony by six other witnesses.

The testimony for the defendant was in sharp conflict with that for the plaintiff. That testimony was to the effect that the trouble with plaintiff's sawmill was old-age and improper care and operation; that stock would drink out of the branch; that soap would lather in the water from the well, and that that water would wash clothes clean, and would make good tea, and would not turn black when boiled, and that rice cooked in it would not turn black, as claimed. Experiments were made before the jury to show that these things were true, and the results of some of the experiments are before us as original exhibits. Water was brought from the wells during the trial, tasted by four witnesses, all of whom testified that so far as taste, look, and smell, were concerned, it was good drinking water. These witnesses included J. G. Burch, health officer of the county, who said that so far as taste was concerned this water was above the average of what he was used to drinking in the county.

Samples of the water taken from the Looney well, the Shortridge well, the filter pools, and various places in Enoch's branch were analyzed. These analyses were made by J. M. Weaver, chief chemist of a well-known firm of testing engineers and chemists, and by the chemist of the city of Columbus, Ohio, a specialist in water analyses.

They testified, and their analyses are in the record and are in technical language. Mr. Weaver testified that the overflow from the third filter pool, which is the one from which the mine water goes immediately into the branch, "is rather acid, and high in mineral content;" but that water with that much iron has been considered satisfactory in the State for drinking water; that from the mineral standpoint the water in the Looney well was better than average; but

that the Shortridge well had a little more iron than is usually considered satisfactory from the taste standpoint.

The evidence for the defendant is persuasive but not conclusive. The jury heard the witnesses, saw the experiments in court, viewed the premises, and tasted the water. They were instructed that the pollution must be material. There was evidence before them sufficient to support their finding for the plaintiff on this point if they accepted it. There was evidence, for example, in rebuttal, that the samples Weaver analyzed were taken at a time of high water. Whether an owner's use of the water on his own land that afterwards flows through a neighbor's land is a reasonable use, and whether damage resulting to a lower riparian owner is material and substantial, are in their nature primarily jury questions, and where there is evidence which the jury might reasonably believe and from which they may draw reasonable inferences, their verdict, approved by the trial court, may not properly be disturbed.

There is evidence, however, in the case upon which there is not any conflict. There is undisputed evidence that the water from the defendant's mine is free from bacteria. It is also shown without conflict that there is substantial and material pollution of both the wells and the branch caused by conditions for which the plaintiff is responsible.

The Looney well is about 120 feet from Enoch's branch. The plaintiff's house is between the well and the branch, and a road runs between the house and the branch. The plaintiff's sawmill is 650 feet above the house, and there is a sluiceway under the sawmill which carries the sawdust from the mill into the branch. The pictures show large quantities of sawdust in the branch and on its edge. Three hundred and fifty feet above the house is a hog pen on the bank of the branch, and the plaintiff kills hogs on the branch and throws the entrails into the branch. Two hundred feet above the plaintiff's house is the dwelling house of his son. One hundred feet above the plaintiff's house is an open toilet, over the edge of the branch. About 50 feet above the toilet is a place where chickens roost about

10 feet from the branch, from which the ground slopes toward the branch. There is a shop on the bank of the branch below the toilet, and a wash house about 15 feet below the shop from which the wash water is emptied into the branch. Above the plaintiff's sawmill and about a quarter of a mile above his house there are two coal openings made by the plaintiff on his own land from which mine water drains into Enoch's branch. It appears that there is a smaller quantity of water flowing into the branch from these openings than from the opening on the defendant's land, but the difference is not definitely shown. It does appear from the evidence that the quality of this water from the plaintiff's land is the same, and its effect is of like kind, as the mine water from the opening on the defendant's land, and that the openings on the plaintiff's land have existed as long as those on the defendant's land. The structures mentioned are all on higher elevation than the wells.

It is not surprising, therefore, that when the plaintiff's wife had this water from the wells analyzed by J. G. Burch, sanitation officer for the State Health Department, and a witness for the defendant, as noted above, he found the water in both wells badly polluted with B-Coli bacteria and unfit and unsafe for use; and the analyses by the other chemists showed the same condition. Burch's analysis was made and reported to the plaintiff a short time before this suit was brought. It is rather probable that the plaintiff then thought that the mine water was responsible for the contamination.

The Shortridge well is a drilled well, situated across the State highway from the plaintiff's house, 200 feet from the highway, 300 feet from the mouth of Enoch's branch, and 50 feet from Slate creek, a much larger stream than Enoch's branch, and also carrying mine waters. This well serves the home of Woodrow Shortridge and his wife, son-in-law and daughter of the plaintiff, neither of whom testified in the case.

If the water supplied by the wells in this case had been made unfit for use by the acts of the plaintiff, or had been

substantially polluted by him, then assuredly this defendant should not be charged beyond the damage caused by it. The plaintiff should not recover from this defendant for damage he did to his own property. The truth of this was recognized by the trial court, and by instruction No. 11, given for the defendant without objection, the court told the jury that even though the defendant polluted the waters, yet if the plaintiff himself had substantially polluted them, and they were unable to tell from the evidence the extent of the pollution by the plaintiff, their verdict should be for the defendant.

This is in accord with the decision in *Pulaski Anthracite Coal Co.* v. *Gibboney Sand Bar Co.*, 110 Va. 444, 66 S. E. 73, 24 L. R. A. (N. S.) 1185, where it is stated:

"Moreover, we are of opinion that plaintiff's instruction No. 1 is an incorrect statement of the law of this case. No one can be required to answer in damages for the wrong of another, with whom he was not in privity or concert, and whose action he could not control. This case comes within the purview of the line of authorities dealing with pollution of streams, the pollution causing damage to health or property, and though there is seeming lack of harmony in the authoriites, the unmistakable weight thereof is that where there are several concurrent negligent causes, the effects of which are separable, due to independent authors, neither being sufficient to produce the entire loss, then each of the several parties concerned is liable only for the injuries due to his negligence. * * *

"The rule of law is stated in Jaggard on Torts, p. 797, as follows: 'But the liability of joint contributors is not necessarily that of joint tort feasors. If persons who maintain a nuisance act independently, and not in concert with others, each is liable for damages which result from his individual conduct only. And the fact that it may be difficult to actually measure the damages caused by the wrongful act of each contributor to the aggregate result does not affect the rule, or make any one liable for the acts of others.' See also Gould on Waters, sec. 222; 14 Ency. Pl.

& Pr., 1108; *Chipman* v. *Palmer*, 77 N. Y. 51, 52, 33 Am. Rep. 566; *Little Schuylkill Nav. R., etc., Co.* v. *Richards*, 57 Pa. 142, 98 Am. Dec. 209; *Missouri* v. *Illinois*, 200 U. S. 496, 26 S. Ct. 268, 50 L. Ed. 572."

See also, *Farley* v. *Crystal Coal, etc., Co.*, 85 W. Va. 595, 102 S. E. 265, 9 A. L. R. 933, and note; *Walters* v. *Prairie Oil, etc., Co.*, 85 Okla. 77, 204 P. 906; *Mansfield* v. *Brister*, 76 Ohio St. 270, 81 N. E. 631, 118 Am. St. Rep. 852, 10 L. R. A. (N. S.) 806; *Masonite Corp.* v. *Burnham*, 164 Miss. 840, 146 So. 292, 91 A. L. R. 752, and note; 20 Am. Jur., pp. 149, 150; 27 R. C. L., p. 1225.

■ If a plaintiff cannot recover entire damages from one of two wrongdoers who injure him while acting independently, there is even less reason to allow such recovery when the plaintiff himself caused or materially contributed to his own damage. No person is entitled to recover from another for damages which have been occasioned by his own act or his own neglect. *Bowman* v. *Humphrey*, 132 Iowa 234, 109 N. W. 714, 6 L. R. A. (N. S.) 1111, 11 Ann. Cas. 131.

■ The plaintiff here offered no evidence showing or tending to show what proportion of the damage resulted from the acts of this defendant. If there were mine waters in the Shortridge well the evidence is silent whether they seeped in there from Slate creek, only 50 feet away, or from Enoch's branch 300 feet away. If the plaintiff himself had made the Looney well unsafe and unfit for use, independently of mine water in it for which defendant was responsible, this defendant is not responsible for the entire damage to the Looney well. There was mine water reaching Enoch's branch from the coal openings on the plaintiff's land. If mine water injured plaintiff's sawmill and wells there should be evidence to afford some reasonable basis for the jury to determine the proportion of it from defendant's mine. The maximum damage the plaintiff claimed for his sawmill was $300. There was no way under this evidence for the jury to say what damage the defendant caused, except by guess. This that was said in *Chesapeake, etc., Ry.*

*Co.* v. *Whitlow,* 104 Va. 90, 94, 51 S. E. 182, in a similar situation, though on different facts, applies here: " * * * where damages are claimed for injuries which may have resulted from one of two causes, for one of which the defendant is responsible, and for the other of which he is not responsible, the plaintiff must fail if his evidence does not show that the damages are produced by the former cause. And he must also fail if it is just as probable that the damages were caused by the one as by the other, since the plaintiff is bound to make out his case by a preponderance of the evidence. * * * "

It was part of plaintiff's case to show the amount of his alleged damage, and with a reasonable degree of certainty to show the share of the defendant therein. This he has wholly failed to do. This was an essential element of his case. Without evidence upon that point he did not make a case upon which he was entitled to recover. The trial court so told the jury in instruction No. 11 which the plaintiff says in his brief "fairly presented this question to it." But the jury did not heed that instruction, and in some way, uncertain and impossible to determine from this record, they found a verdict for the plaintiff. Plaintiff further says in his brief that "there was testimony before the court and jury in this case from which the jury could have found that the plaintiff himself did pollute Enoch's branch, for the short distance from his sawmill to Slate creek, a distance of more than 1,000 feet. But the jury did not so find or it would have returned a different verdict." But the jury had no right to disregard this evidence, and the further evidence that the plaintiff himself drained mine water into the branch above his sawmill, because that evidence was undisputed and undenied.

The verdict that was rendered was therefore contrary to the evidence and without proper evidence to support it. It must be set aside and judgment entered here for the defendant.

*Reversed and final judgment.*