C. W. REGAN, INC., a New York Corporation, and Nager Electric Company, Inc., etc., et al., Appellees,

v.

PARSONS, BRINCKERHOFF, QUADE AND DOUGLAS, Appellants.

C. W. REGAN, INC., a New York Corporation, and Nager Electric Company, Inc., etc., et al., Appellants,

v.

Bernard F. DIAMOND, Individually and t/a Diamond Construction Company, Appellees.

Nos. 12335, 12336.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 1, 1968.

Decided June 13, 1969.

Terry H. Davis, Jr., Taylor, Gustin, Harris, Fears & Davis, Norfolk, Va., for C. W. Regan, Inc. and Nager Electric Co., Inc.

Harry E. McCoy, Robert M. Hughes, III, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for Parsons, Brinckerhoff, Quade and Douglas.

Thomas W. Moss, Jr., Stant, Moss & Rafal, Norfolk, Va., for Bernard F. Diamond and Diamond Const. Co.

Before HAYNSWORTH, Chief Circuit Judge, BRYAN, Circuit Judge and McMILLAN, District Judge.

McMILLAN, District Judge:

## PRELIMINARY STATEMENT

Parsons, Brinckerhoff, Quade & Douglas ("Parsons"), defendants, and C. W. Regan, Inc. and Nager Electric Company, Inc. ("Regan"), plaintiffs, both appeal from judgments and final orders entered in the District Court for the Eastern District of Virginia, Norfolk Division, by Judge Oren R. Lewis following split trials on liability in June, 1966, and on damages in July, 1967. The final judgment was in favor of the plaintiff, Regan, a tunnel building contractor, and against the defendant Parsons, a firm of consulting and supervising engineers, for property damage in the amount of $157,454.-50. The defendant appellee Bernard F. Diamond, trading as Diamond Construction Company ("Diamond"), another tunnel building contractor on the same job, was found by the jury not to be liable to the plaintiffs.

The suit, filed in 1965, arose out of the partial flooding on Ash Wednesday, March 7, 1962, of the new or second midtown tunnel under the Elizabeth River between Norfolk, Virginia, on the east, and Portsmouth on the west.

## THE PHYSICAL FACTS

The Elizabeth River Tunnel Commission in 1960 contracted with various contractors to build the tunnel, about 4,300 feet long. The tunnel had three generally separate sections: (1) the "tube" section; (2) the "cut and cover" sections; and (3) the "open approaches." The open approaches are simply the access roads and supporting structures leading to the portal or tunnel mouth where the tunnel first goes underground. The cut and cover sections slope through the river banks into the river. They were built by cutting a sloping shaft and putting the tunnel tubes in the shaft and re-covering the shaft. The tube portion was built by digging a ditch under the river (to a maximum depth of about 100 feet below water level); by constructing sections of tunnel about 300 feet long and 30 feet in diameter with each end sealed by a steel bulkhead; by floating these sealed sections into place and filling their hollow walls with concrete or by some other method sinking them into place and sealing them together in the ditch to form one continuous tube. Thereafter the temporary steel bulkheads at the end of each section were removed, leaving one continuous tube through which the road runs. A ventilating building or tower was built near each end about 200 feet offshore from the portal.

The defendant Parsons was employed without written contract to prepare overall plans and specifications and to act as consulting and supervising engineer for the Tunnel Commission.

The defendant Diamond was employed under a written contract for a base fee of $11,631,669 to "rough in" the tube section and the cut and cover sections and to build the foundations of the ventilating buildings.

The plaintiff Regan was employed under a written contract for a base fee of $3,574,000 to build the open approaches and certain retaining walls; to install a roadway through the tunnel; to finish off the ventilating buildings and to finish off the entire tunnel and approaches and install electrical and drainage systems.

One of Regan's jobs was to run electrical cables within the tunnel between the two ventilating buildings. This work ultimately required portal to portal access to the tunnel by Regan.

At the east or Norfolk portal there was installed a steel tide gate which could be raised for access and lowered to seal off possible flooding through the open cut. However, the ground level on the Portsmouth side was higher than the Norfolk side, and the plans called for retaining walls and approaches, to be built by the plaintiff Regan, above the level of any recorded or anticipated tide

or flood; and therefore a tide gate was not planned for the Portsmouth side.

In November, 1961, the moveable steel tide gate was in place in the east or Norfolk end, and the only remaining metal bulkhead was inside the tunnel about 500 feet from the Portsmouth portal and about 300 feet offshore from the ventilating building. This metal wall was interfering with the work of both Diamond and Regan. Specifically, it was preventing Regan from pulling cables through from one ventilating building to the other; and it was time for it to be removed.

Diamond sought permission in November, 1961, to cut out the steel bulkhead, and to build a wooden bulkhead at the portal, between the ventilating building and the shore, where the open approach to the tunnel ended. The purpose of the wooden bulkhead was to keep out water; ground water and seepage were the water sources anticipated; a flood tide was not anticipated. Diamond drew the plans for this wooden bulkhead. Parsons examined the plans and made certain recommendations for changes in the plans so that the bulkhead would be *structurally* stronger. The plans themselves as drawn by Diamond called for a "sandwich" of aluminum foil and layers of felt between wooden timbers, and for felt packing around the edges "to provide seal against concrete." Caulking the edges of the wooden bulkhead if needed, and fitting its edges against the masonry to prevent leakage were, on the uncontradicted evidence, field construction details which were the contractor's—not the engineers'—responsibility. As approved, the wooden bulkhead was constructed, and the steel bulkhead which had been blocking Regan's electrical work was removed.

By March 7, 1962, Diamond had almost completed its basic heavy structural work. The tube section and the cut and cover sections had been installed; the foundations for the ventilating buildings had been built by Diamond and turned over to Regan for completion; and the tunnel was open from end to end except for the wooden barricade at the Portsmouth or west portal and the moveable steel partition or tide gate at the Norfolk or east portal. Regan, the plaintiff, was the chief contractor then on the job. Regan was finishing off work including installing electrical cables between the ventilating buildings in the tunnel. Regan, however, was several months behind the contract schedule and had not installed the retaining walls on the Portsmouth side.

On March 7, 1962 an unprecedented combination of moon, winds and high tides produced a water level in the river of 10.2 feet above mean low water, more than three feet above any previous recorded spring tide. Shortly before 8:00 A. M., flood water began pouring into the tunnel from three sources—the Norfolk end, the Portsmouth end, and the Portsmouth ventilating building. Apparently it started first at the Portsmouth end.

At the Portsmouth portal the wooden, felt and aluminum bulkhead held without structural failure against a 30-foot head of water. However, the plaintiff Regan had drilled some small holes in the bulkhead through which water came under pressure; and water leaked into the tunnel around the edges of the bulkhead.

At the Norfolk portal, Parsons' engineers, upon telephone request from Regan, closed the steel tide gate as far as it would go. However, they could not close it all the way. A four-inch water discharge line and a two-inch air line, both belonging to Diamond, and a one-inch steel water line belonging to Regan all entered the Norfolk end under the steel gate and were being used by Regan. Diamond's people refused to remove or cut these lines because they served air lines and pumps inside. The result was that, for more than six hours, water ran from the sloping tunnel entrance under about thirty feet of pressure and through the opening (which was at least two inches in diameter and close to thirty feet long) and into the tunnel. Finally, some time after 2:00 o'clock, after the tunnel had collected large quantities of water,

Diamond's men opened up this tide gate, let all of the water which filled the sloping approach into the tunnel, and cut the pipes and lines and closed the steel tide gate. Testimony shows that the crack underneath the tide gate was enough of an opening to fill the tunnel completely with water in that period of time if it had not become somewhat obstructed by debris.

A third and probably equal source of water was the unfinished ventilating building a couple of hundred feet offshore from the wooden bulkhead near the west or Portsmouth end of the tunnel. Water came into the tunnel through a number of two, three, six and eight-inch holes in the foundations of the ventilating building. Testimony indicated that the input through this ventilation shaft could have been more than 90,000 gallons an hour, which would be as great as the input around the wooden bulkhead. Regan was in sole charge of the ventilating building and the holes in the foundations were conduits for Regan's cables.

To summarize the physical situation simply: A great quantity of water came into the tunnel and caused damage. The water came from three sources. The plaintiff was in partial control of one source—the Norfolk end. The plaintiff was in sole control of the second source —the open ventilating building. The plaintiff was partly responsible for the third source—the leaky wooden bulkhead —because of the holes he had drilled in it for pipes and wires. The defendant Diamond had done the planning and the building of the wooden bulkhead; making it watertight was Diamond's duty. The engineer, Parsons, was alleged to be responsible for the leaks around the wooden bulkhead because of Parsons' approval of the structural soundness of the plans drawn and submitted by Diamond.

Each of the three independent sources of water could be found from the evidence to have contributed about equally to the damage plaintiff complained of.

## THE CONTRACT ARRANGEMENTS

The engineer Parsons had no written contract with anyone.

The Contract Documents, Defendant Exhibits 23, 24, and 25, consisted of the formal contracts between the Tunnel Commission on one hand and Regan and Diamond on the other, which contracts incorporate the Plans and Specifications for the tunnel and the Road and Bridge Specifications of the Virginia Department of Highways, as modified and supplemented by the Plans and Specifications. In pertinent part, these documents are set out by footnote.[1]

1. "SECTION 105—CONTROL OF WORK "Sec. 105.01 AUTHORITY OF ENGINEER—The Engineer shall decide all questions which may arise as to the quantity, quality, acceptability, fitness and rate of progress of the several kinds of work to be performed and materials to be furnished under the contract; all questions which may arise as to the interpretation of any part of the contract, especially the plans and specifications which are made a part thereof; all questions as to the *acceptable fulfillment of the contract* on the part of the contractor; all disputes and mutual rights between contractors, and all questions as to compensation. The determination and decisions of the Engineer in these matters shall be final and conclusive.

\* \* \* \* \*

"Any approval by the Engineer of any materials, workmanship, plant, equipment, drawings, program, methods or procedure, or of any other act or thing done or furnished, in or in connection with the performance of the work, shall be construed merely to mean that at the time the Engineer knows of no good reason for objecting thereto; and no such approval shall release the Contractor from his full responsibility for the accurate and complete performance of the work in accordance with the Plans and Specifications or from any duty, obligation or liability imposed upon him by the provisions of the Contract."

"Sec. 105.02 DEVIATION FROM THE PLANS, PROFILES, ETC.—There shall be no deviation from the plans, profiles, cross-sections, specifications, special provisions or approved working drawings ex-

cept by mutual agreement between the Department and the Contractor. * * * "Nothing herein contained shall limit the right of the Engineer to interpret the specifications, special provisions, plans, profiles, cross-sections and working drawings to meet field conditions encountered in the prosecution of the work.

"(b) The Contractor may, at any time, submit to the Engineer for his written approval, proposed improvements for simplifying or facilitating the work. * * * No work shall be done under such suggested changes prior to obtaining therefor the written approval of the Engineer. *The approval of any such changes suggested by the Contractor shall not be construed as relieving him of any responsibility for the adequacy and proper construction of the work in accordance with the requirements of the contract.*"

"Sec. 105.03 PLANS AND WORKING DRAWINGS—Plans consisting of general drawings and showing such details as are necessary `to give a comprehensive idea of the construction contemplated will be furnished by the Department. * * * "The Contractor shall furnish such working and detail drawings, not furnished by the Department, as may be required for any part of the structure.

\* \* \* \* \*

"It is expressly understood that the approval by the Department of the Contractor's working drawings *relates to the requirements for strength and detail,* and such *approval will not relieve the Contractor from responsibility for errors in dimensions.*

"(e) The Contractor shall submit to the Engineer the designs and working drawings for plant and *temporary structures* required in the work as provided in Sec. 104.06. *Such approval, however, will not relieve the Contractor of his responsibility for the adequacy of their design, construction and use, and he shall make good all injuries to persons or things arising on account of them.*

"Sec. 105.09 AUTHORITY AND DUTIES OF INSPECTORS.—Inspectors employed by the Department shall be authorized to inspect all work done and material furnished. Such inspection shall extend to all or any part of the work and to the preparation, fabrication or manufacture of the material to be used. The Inspector is not authorized to alter or waive the provisions of these specifications.

"The Inspector is placed on the work to keep the Engineer informed as to its progress and the manner in which it is being performed. He shall also call to the attention of the Contractor any non-conformance with plans or specifications. *He shall not be authorized to accept the work or any part of it, to approve any operation or item, to issue instructions contrary to the plans and specifications or to act as foreman for the Contractor.* The Inspector shall have authority to reject defective material and to suspend work which is being improperly performed, subject to the final decision of the Engineer, provided the suspension is confirmed in writing.

"The Inspector shall exercise such additional authority only as may from time to time be delegated by the Engineer, who shall also advise the Contractor of such delegations of authority affecting his operations."

"Sec. 105.10 INSPECTION OF WORK —All materials and each part or detail of the work and equipment shall be subject at all times to inspection by the Engineer or his authorized representatives, and the Contractor shall cooperate in making such inspections. All materials furnished, equipment used and work performed shall conform to the specifications, supplemental specifications, plans and special provisions. Such inspection shall include mill, plant and shop inspection, and any material furnished under these specifications shall be subject to such inspection. The Engineer and his representatives shall have access·to all parts of the work and shall be furnished with such information and assistance by the Contractor as is required to make a complete and detailed inspection.

\* \* \* \* \*

"Sec. 105.11 REMOVAL OF DEFECTIVE AND UNAUTHORIZED WORK— All work and materials which do not conform to the requirements of the contract shall be considered as defective work.

"Any defective work, whether the result of poor workmanship, use of defective materials or equipment, damage through carelessness or any cause found to exist prior to the final acceptance of the project, shall be corrected or removed and replaced with materials which shall conform to the specifications or shall be otherwise remedied and made acceptable in a manner authorized by the Engineer.

\* \* \* \* \*

"Sec. 105.12 FINAL INSPECTION AND ACCEPTANCE—Upon due notice from the Contractor of presumptive completion of the entire project, the Engineer shall, within ten (10) days, make an inspection thereof. When all of the materials have been furnished, all of the work performed and the construction provided and contemplated by the contract has been satisfac-

By the contract documents Diamond, Regan and the Tunnel Commission agreed that Parsons, as the owner's representative, should have certain authority to supervise and inspect and reject so as to procure for the Tunnel Commission the ultimate permanent result called for by the contracts; but the documents do not impose upon the engineer, not a party to the contracts, any *duty* towards the contractors or their personal property. To the contrary, Section 107.13 requires the contractor to indemnify the engineer against claims and suits arising out of the contractor's *"operations,"* negligent or otherwise; and Section 107.17 expressly provides that the engineer, as an agent and representative of the Commission, shall have no personal liability in carrying out any power and authority under the contract or the specifications.

Independent of the contract documents, but corroborating them, the uncontradicted testimony is that Parsons' mandate from the Tunnel Commission was to supervise, inspect and reject for the purpose of seeing to it that the *permanent construction* was built in accordance with the plans and specifications. As to temporary structures, the uncontradicted testimony is that the engineer's inspection is confined to *structural* soundness; that approval of the contractor's working drawings for the temporary bulkhead meant simply,

"that at the time the engineer knows of no good reason for objecting thereto;"

that each contractor had the duty of protecting his own work; and that fitting the wooden bulkhead against the masonry and caulking it against leakage were all field construction details which were the *contractor's*—not the engineer's —responsibility. No duty to inspect the details of temporary construction nor to protect the property of one contractor from negligence of another contractor was shown.

## THE CASE AGAINST THE ENGINEER PARSONS

Three theories were suggested as basis for liability of the engineer Parsons to the contractor Diamond. These were: (1) that Diamond was a third party beneficiary of an assumed contract between Parsons and the Tunnel Commission; (2) that Parsons breached some warranty to Diamond by not properly performing his contract with the Tunnel Commission; (3) that the relationship

---

torily completed, all in accordance with these specifications, the work shall be accepted and the Contractor notified of such acceptance.

"If, however, at such inspection any work in whole or in part is found unsatisfactory, the Engineer shall give the Contractor the necessary instructions as to *replacement of material and performance of work necessary and prerequisite for final acceptance,* and the Contractor shall comply with and execute such instructions subject, if required, to another inspection prior to acceptance. In any event, it is the Contractor's responsibility to maintain the project until final acceptance, except under such conditions as may be specifically exempted."

   \*    \*    \*    \*    \*

"Sec. 107.13 RESPONSIBILITY FOR DAMAGE CLAIMS. \* \* \* *The Contractor shall indemnify* and save harmless the Commission, its members and their successors, and all of its officers, agents and employees, and *the Engineer* and his agents *from all suits, actions or claims* of any character, name and description brought for or *on account of any injuries or damages received* or sustained by any person, persons, or property *on account of the operations* of the said Contractor or his subcontractors, *whether or not* the same be due to the use of defective materials, defective workmanship, neglect in safeguarding the work, or by or on account of any act, omission, neglect or misconduct of the said Contractor or his subcontractors \* \* \*."

   \*    \*    \*    \*    \*

"Sec. 107.17 PERSONAL LIABILITY OF PUBLIC OFFICIALS. \* \* \* In carrying out any of the provisions of these Specifications, or in exercising any power or authority granted to them by or within the scope of the Contract, *there shall be no personal liability upon* the members of the Commission, *the Engineer* or their authorized representatives, it being understood that in all such matters they act solely as agents and representatives of the Commission." (Emphasis added.)

of the parties gave rise to a duty on Parsons to see to it that one contractor did not by negligence damage the property of another.

The third party beneficiary theory was abandoned at the trial; no evidence was offered to support it; and the count alleging this theory was dismissed from the complaint by court order of July 20, 1967.

■ The next theory—negligent breach of warranty—is not supportable. Regan was not a party to the agreement between Parsons and the Tunnel Commission. Recovery for negligent breach of warranty on behalf of one not a party to the agreement is contrary to the law of Virginia as it stood when the rights of these parties were fixed on March 7, 1962. General Bronze Corporation v. Kostopulos, 203 Va. 66, 122 S.E.2d 548 (1961) (rehearing denied Jan. 15, 1962). General Bronze manufactured some sliding doors and sold them to a distributor. The distributor sold them to a general contractor. The general contractor installed them in the plaintiff's motel. The doors leaked, causing property damage. The motel owner sued the contractor, the dealer and the manufacturer, alleging breach of warranties of fitness and quality. A judgment was rendered on a jury verdict against General Bronze for over $11,000 and General Bronze appealed. The Supreme Court of Appeals of Virginia reversed and ordered judgment final in favor of the manufacturer. The action, said the court, could not be maintained on the basis of negligence without privity of contract. General Bronze had no contract with the plaintiff and recovery was denied.

Moreover, independent of any questions about privity of contract, the theory of breach of warranty is completely rebutted by the terms of the plaintiff's own contract. Implied warranty is expressly excluded by Section 105.01, quoted in the footnote, which says that "any approval by the engineer of any * * * drawings * * * shall be construed merely to mean that at the time the engineer knows of no good reason for objecting thereto * * *." Section 105.-03 contains the express agreement that "the approval by the Department of the Contractor's working drawings relates to the requirements for strength and detail, and such approval will not relieve the Contractor from responsibility for errors in dimensions." Section 107.-13 contains the express agreement that the Contractor will indemnify the Engineer from liability on account of the operations of the Contractor, and Section 107.17 says that the Engineer shall have no personal liability in carrying out the work described in the contract documents.

■ These provisions are totally inconsistent with any implied warranty in some other unwritten contract which would make the engineer responsible to one contractor for the negligence of another contractor.

■■ The third theory of action—negligent performance of a duty of inspection which arose out of the relationship between the parties—is also invalid. Parsons is not charged with the creation of any condition nor with any active conduct. Parsons is charged with negligence in the approval of plans for a temporary bulkhead which four months later proved to be leaky. There was no evidence of any duty on the part of Parsons to specify how the bulkhead should be caulked nor how it should be fitted against the surrounding masonry walls. No defect in the plans was suggested nor shown. All the evidence showed that the manner of fitting the bulkhead against the masonry and the manner of caulking to prevent leaks were field details which were the responsibility of the contractor. No damage resulted from any defect in the plan. Such damage as may have resulted arose either from improper installation or from changes in the shape and fit of the bulkhead in the four months from the time it was installed until the time of the flood. The duty of the engineer to obtain for the owner a tunnel according to plans and

specifications does not carry with it a duty to see to it that one contractor's negligence does not damage the property of another contractor, and does not create a continuing duty of inspection as to temporary details of construction of temporary structures. This theory is also inconsistent with the express provisions of the contract documents themselves, which have already been quoted by footnote in the discussion of breach of warranty.

It is no doubt true that engineers and architects have a duty of care in drawing plans and in carrying out duties which they have accepted. It is possible, of course, for an engineer to assume such sweeping duties of supervision and control over all details of construction that nothing else appearing he may be held to have assumed a duty to parties outside his contract. See, for example, Associated Engineers v. Job, 370 F.2d 633 (8th Cir. 1966) (rehearing denied Feb. 21, 1967), where although the engineer was held liable the Court recognized and cited various lines of authorities including Ramos v. Shumavon, 21 A.D.2d 4, 247 N.Y.S.2d 699 (S. Ct.App.Div.1964), Aff'd. Per Curiam, 15 N.Y.2d 610, 255 N.Y.S.2d 658 (Ct. of App. of N.Y.1964), 203 N.E.2d 912 (1964), and said:

"We are not, as Associated suggests, converting every supervising engineer into a safety engineer as a matter of law. *We are simply construing a contract.*" (Emphasis added.)

Most closely in point is the case of Ramos v. Shumavon, *supra.* The general contractor on an expressway construction project built some temporary concrete forms. The forms collapsed causing injury to Ramos and the death of two others, all employees of the general contractor. Suits were brought on account of the death and injuries against Shumavon and Buckley, supervising engineers engaged by the state. The evidence showed that the forms had been improperly constructed and maintained by the general contractor. The question was whether the supervising engineer was liable because he did not affirmatively inspect and discover the condition of danger. As in the present case, there was no evidence of negligence by any act of *commission;* it was a passive failure to inspect and advise that was charged against the engineers.

The Court turned to the contract documents to find what the obligations of the parties were, the Court saying that,

"In order to sustain the plaintiffs' position we must find in the contracts not only a clear obligation on the part of the defendants to perform in the area in question, but we must also find an intention that for a breach of such obligation the defendants are to be liable *to the workmen on the job* (Cf. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 164, 159 N.E. 896, 897; Rigney v. New York Central & H. Riv. R. R. Co., 217 N.Y. 31, 37, 111 N.E. 226, 227–228; Smyth v. City of New York, 203 N.Y. 106, 96 N.E. 409)."

The agreement between the state and the *engineers* provided that:

"ARTICLE 1. Work to be Done and Contract Documents. The Engineer shall ascertain the standard practices of the State prior to the execution of any of the work required by this Agreement. All work under this Agreement shall be performed in accordance with these standard practices and the provisions of the contract documents."

The Court denied liability under the quoted provision because of lack of showing that "standard practices" required a positive duty of continuing inspection on the part of the engineers to insure the safety of workmen. The contract between the state and the *contractor* (employer of the plaintiffs) contained the following provision:

"CONDUCT OF WORK. The Contractor shall, by working methods and orders of procedure *subject to the approval of the Engineer,* conduct the work in the most expeditious manner possible, having due regard for the *safety of persons* and property and

safety for traffic, and for reducing to a minimum the encumbrance of the streets and site of the work with construction materials."

The Court held that this language did not require the engineer to guarantee the safety of the employees of the contractor, saying:

*"As we read the pertinent documents the defendants were hired, in effect, to see to it that the State obtained the end product it bargained for—a properly constructed portion of the Expressway.* There being no contractual duty regarding the safety of the workmen the judgment against these defendants may not stand and the complaint must be dismissed."

The motion of Parsons for a directed verdict should have been allowed.

## THE CASE AGAINST DIAMOND

■■ The Court held separate trials on the issues of liability and damages. Under Virginia law it appears impossible fairly to separate the issue of liability from the issue of damages where as here the separate and unconnected defaults of several people may have produced the total damage. In Heldt v. Elizabeth River Tunnel District, 196 Va. 477, 84 S.E.2d 511 (1954), a Virginia landowner sued the Tunnel Commission for property damage allegedly caused in the construction of the first Norfolk-Portsmouth tunnel. The evidence was in conflict whether the damage was caused by the plaintiff's failure to have her buildings equipped with gutters, or by acts of the contractors, or by other causes. The court said:

" * * * If the damage was occasioned by a combination of these causes, it was for the jury to determine from the evidence *what part was* attributable to the construction of the tunnel and *what part to other causes. If the evidence was not sufficient for the jury to determine with a reasonable degree of certainty that all of the damage, or what part thereof, was occasioned by the construction of the*

*tunnel, then the plaintiff was not entitled to a verdict against the Tunnel District.* (Emphasis added.) Panther Coal Co. v. Looney, 185 Va. 758, 771, 772, 40 S.E.2d 298, 304, 305."

In Panther Coal Co. v. Looney, a judgment against the coal company defendant was reversed because of the impossibility of determining the part which various independent causes may have played in the pollution of a stream. It thus appears that the plaintiff was entitled at least to an instruction that the plaintiff was entitled to recover from the defendant Diamond such portion of the plaintiff's damages, if any, as the jury might find had been caused by negligent acts or omissions on the part of Diamond.

■ It further appears that plaintiff is entitled to an instruction that it can recover despite some contributory negligence if plaintiff can show what part of the damage was caused by the actionable conduct of Diamond, in which Regan did not participate.

■ The split trials eliminated any quantitative judgment by the jury as to the amount of damage which resulted from plaintiff's own conduct and the amount which resulted from conduct of Diamond. Although separate trials have their uses, it would appear that separating the issues of liability and damages in this kind of fact situation can only produce confusion and prevents the jury from any serious consideration of the respective roles of the parties in the creation of the damage.

■ It also appears that the court erred in charging the jury regarding the standard of care to which Parsons, the engineer, was held, and that this error may well have affected the jury's judgment in deciding whether to hold Diamond in the case. Under the law of Virginia an architect or engineer, undertaking a job,

" * * * implies that he possesses the necessary competency and ability, to enable him to furnish plans and specifications prepared with a *reason-*

*able degree of technical skill.* He must possess and exercise the care of those *ordinarily skilled* in the business, * * * he is not liable for fault in construction resulting from defects in the plans because he does not imply or guarantee a perfect plan or a satisfactory result; * * *." Surf Realty Corp. v. Standing, 195 Va. 431, 78 S.E.2d 901, 907 (1953). (Emphasis added.)

The court did not charge the jury according to the Virginia law on this subject. Instead, he repeatedly drew a contrast between the duty required of the "highly skilled" engineer and the lesser skill required of Diamond. He said that:

" * * * the engineers are skilled, they are highly trained in a specialized science; * * * in gauging whether they used ordinary care under the circumstances, you should evaluate the degree of care or the lack of care that they used, based upon their skill, that is the skill that they held themselves out to have; * * * you should determine, gauging their requirements, taking into consideration their *purported* skill in this particular field of endeavor; * * * with the word 'approval' goes the general knowledge that you would expect *a highly skilled* engineer engaged in this business would encompass; * * *."

Reading the charge as a whole, it appears that the court applied a double standard to the respective duties of the engineer and the contractor; that this might well have influenced the jury to let Diamond out and hold the "highly skilled" engineers liable; and that this may well have affected the outcome of the trial.

Therefore, it appears that the plaintiff is entitled to a new trial against Diamond. Upon re-trial it is felt that although split trials are usually discretionary, split trials in this case should not again be undertaken for the reasons set out herein. Upon re-trial it would also appear proper to allow pleading and proof, if desired, of the defense, asserted but rejected, that as to some $132,000

out of the total $157,454.50 of damage the real parties in interest are not Regan at all but several subcontractors who owned the property—or their subrogated physical damage insurers.

As to the defendant Parsons the cause is reversed and remanded for entry of judgment in favor of Parsons.

As to the defendant Diamond the cause is remanded for a new trial. ·