# Richmond.

## NORFOLK & WESTERN RAILWAY CO. v. POOLE'S ADM'R.

### January 23, 1902.

1. NEGLIGENCE—*Burden of Proof—Probability.*—Where damages are claimed for injuries inflicted through the alleged negligence of the defendant, the burden of showing negligence by a preponderance of the evidence is on the plaintiff, and if the injury may have resulted from one of two causes, for one of which the defendant is responsible but not for the other, the plaintiff cannot recover; neither can he recover if it is just as probable that the damage was caused by the one as by the other.

2. EVIDENCE—*Credibility of Witnesses—Province of Jury.*—The credibility of witnesses is a matter peculiarly within the province of the jury, who should be left free in each case to determine, in view of all the circumstances, what witnesses, or what parts of the evidence of any witness, they will credit, untrammeled, as far as possible, by inflexible rules.

Error to a judgment rendered December 13, 1900, by the Circuit Court of Nansemond county, in an action of trespass on the case wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*George S. Bernard* and *W. H. Mann,* for the plaintiff in error.

*Davis & Davis,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

This action was brought by the personal representative of William J. Poole, deceased, to recover damages for the death of his intestate caused by the alleged negligence of the Norfolk and Western Railway Company, in whose service he was employed as a fireman on one of its locomotives.

Upon the trial of the cause a verdict and judgment were rendered in favor of the plaintiff, and to that judgment this writ of error was awarded.

The first error assigned is that the verdict is not only without evidence to support it, but is contrary to the evidence produced before the jury.

The record shows that about the 25th day of April, 1899, the railroad company went to work on its track at Kilby Lake to raise the grade at the bridge over the lake about five feet. It appears that the raising of the tracks of a railroad over which trains are running for the purpose of improving the grade of the road is very common, and that the method adopted by the defendant for doing the work in question was that usually adopted by railroads, and was a reasonably safe and proper method for doing the work. That method was to block up the bridge from eight to twelve inches at a time, jack up the track on either side as far back from the bridge as the grade is to be raised, shovel dirt under the ties, and to repeat this until the desired change in the grade has been made. The work thus carried on was continued by the defendant until the grade was raised as high as was desired, when the track was ballasted with slag, commencing at the bridge and extending in either direction about one hundred and fifty feet, the slag being about twelve inches deep at the bridge, and gradually getting shallower until at the end of the one hundred and fifty feet it was only about three inches or less deep. In dumping out the dirt to raise the track some of it would go down the sides of the fill or embankment. To prevent this dirt from going into the waterway at the bridge, wings were built out from the centre of the abut-

ment of the bridge.   These wings were built on a concrete foundation of solid stones, from three and one-half to four feet square, laid in trenches about twelve feet deep, cut in the embankment, and running out from the bridge at an angle of thirty degrees, and high enough to prevent dirt when dumped out near the bridge from filling up the waterway.   The work of raising the bridge and the track on either side of it was finished on or before the 9th day of June, 1899, the day of the accident. On the evening of that day a train load of dirt to widen the embankment was hauled upon it just east of the bridge, and dumped off the cars on either side, forming banks from ten to eighteen inches higher than the top of the rails of the track, and extended from within thirty feet of the bridge some two hundred yards or more eastwardly.   These banks were allowed to remain in that condition on the night of the accident in violation of the defendant company's orders.   About eight o'clock that evening there was a heavy fall of rain, lasting from twenty-five to thirty-five minutes.   Within a few moments after the rain had ceased, the locomotive upon which the deceased was firing, and which was hauling a west-bound train of empty freight cars, left the track about sixty feet east of the bridge, wrecking itself and six or seven cars, which also left the track, and killed the plaintiff's intestate.   No eye-witnesses, if there were any living, testified to the accident.   How the accident occurred and its cause can only be determined, if at all, by the facts and circumstances in existence before and after it occurred as they are disclosed by the evidence.

The plaintiff claims that the evidence shows that the defendant's failure to level the banks on either side of the track caused the water from the heavy rain which fell just before the accident to collect on the road bed, and flow from both directions to the point where the locomotive left the track, and there to overflow the bank on the southern side of the track, causing the fill or embankment on which the track was laid to slough off from

a point about midway between the rails, so that when the train reached that point the track gave way and the engine turned over, causing the death of plaintiff's intestate.

The defendant insists that the undisputed facts and circumstances of the case not only show that the accident was not caused by the overflowing and washing away of the embankment by water which had collected on its road bed, by reason of its failure to remove or level the banks of dirt, but they show that it was caused by the giving way or sliding out of the soft earth underlying the embankment in Kilby Lake, thus causing the southern side of the embankment, for a distance of about one hundred and twenty-five feet immediately east of the bridge, and south of the northern rail, to sink down from six to nine feet.

The facts and circumstances relied on by the plaintiff to sustain his contention are few and inconclusive in their character. Some of his witnesses express the opinion that the point where the engine turned over was the lowest point of grade between the bridge and Suffolk, and that the water from the rainfall did collect upon the road bed, overflow and wash away the embankment where the accident occurred.

To sustain the defendant's contention as to the cause of the accident, the following facts and circumstances are relied on: The testimony of the defendant's watchman, which was uncontradicted, showed that he had passed over the embankment where the accident occurred after the heaviest part of the rain had fallen, and only a few minutes before the accident, and at that time the water upon the road bed was not deeper than the thickness of the soles of his shoes; the rain only lasted from twenty-five to thirty-five minutes. The new earth placed upon the embankment where it gave way was from three to five feet deep, porous and capable of absorbing a large quantity of water. The slag with which the road was ballasted, and which was immediately under the ties and on top of the road bed the evening

before, was still on top after the accident, and showed the prints of the ties, although the road bed upon which the ties rested had sunk from six to nine feet, leaving the embankment north of the north end of the ties, or at least north of the north rail, intact, and as if it had been separated from the southern part of the embankment by a spade for a distance of one hundred and twenty-five feet.

Along defendant's right of way, and at the edge of the lake immediately east of the bridge, and opposite the point where the embankment gave way, bushes or small trees from ten to fifteen feet high, and a telegraph pole, were standing at the time of the accident. Afterwards, it was found that these bushes or small trees had been moved back into the lake from fifteen to twenty-five feet, and were standing erect with their roots, so far as surface indications showed, undisturbed. The telegraph pole was moved back about the same distance at the bottom, but was leaning towards the right of way. The wing wall on the south side, which extended from the centre of the eastern abutment of the bridge at an angle of thirty degrees, as above described, was moved back from and south of the eastern abutment. When the work was commenced in April, the water in the lake, about eighty or ninety feet from the embankment, was fifteen feet in depth. After the accident, it was measured again, and found to be only about twelve feet. Borings in the embankment after the accident showed that below the level of the water there was a soft, wet black layer of earth containing leaves, twigs and other vegetable matter about six feet thick under that portion of the embankment north of the end of the ties and which had not given away; whilst under that portion which had given way or sunk down this layer of black soil was only about two feet thick. The embankment had sunk down or given way up to the abutment of the bridge, a distance of about sixty feet in front of the point where the locomotive turned over, although the banks of earth dumped out on either

side of the track the evening of the accident did not reach nearer than thirty feet of the abutment.

The engineer and employees of the defendant who had charge of the work of raising the track, testified positively that the lowest point of the grade was two hundred feet east of the bridge, and not sixty feet east of it, where the accident occurred, as some of the plaintiff's witnesses expressed the opinion that it was.

These facts and circumstances may not be sufficient to establish the defendant's theory of the cause of the accident, but they all tend to show that the plaintiff's theory of the cause is not correct, and some of them about which there is no controversy are entirely inconsistent with it.

The evidence of the plaintiff does not show with any degree of certainty that the accident was caused by the water collecting upon, overflowing, and washing away the embankment. The preponderance of evidence in the case is against that view, and in favor of the contention of the defendant.

If the accident was caused by the sliding out or giving way of the foundation upon which the embankment rested, as the defendant insists, then it is clear from the evidence that the defendant was not guilty of negligence. The embankment was made by another and wholly different company more than forty years before the accident. It had been used during that long period for the purpose for which it was built. The defendant had no knowledge of any defect in its construction. The defect was not obvious, nor is there any evidence from which it can be inferred how it might or ought to have been discovered by the defendant.

Where damages are claimed for injuries which may have resulted from one of two causes, for one of which the defendant is responsible and for the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damage

was produced by the former cause. And he must also fail if it is just as probable that the damages were caused by the one as by the other, since the plaintiff is bound to make out his case by the preponderance of the evidence. *Searles* v. *Manhattan Rwy. Co.*, 101 N. Y. 661; 1 Shear. & Red. on Neg., sec. 57; *C. & O. Rwy. Co.* v. *Sparrow*, 98 Va., at pages 640-1.

We are therefore of opinion that the evidence does not support the verdict of the jury, and that it ought to have been set aside by the court, and a new trial awarded.

The next error assigned is the action of the court in giving plaintiff's instruction numbered three, which is as follows:

"If the jury believe from the evidence that the death of William J. Poole was caused by the failure of the defendant company to use ordinary care in the construction and maintenance of its road bed, at the place of the accident, the plaintiff is entitled to recover in this action, and they may assess his damages at such sum as they may deem fair and just under all the circumstances of the case, such damages not to exceed ten thousand dollars ($10,000.)"

The objection to that instruction is that it made the defendant responsible for the defective construction of the road bed where the accident occurred, when it was first built.

The instruction is not, perhaps, as clear as it might be, but it does not make the defendant responsible for the negligent act of its predecessor in the original construction of the embankment in question, if there was negligence, nor do we think that the jury could have reasonably so construed it. Upon the next trial, if the court is asked to give a like construction, it should so frame it as to exclude any ground for the objection now made.

The remaining assignment of error is to the action of the court in giving for the plaintiff his instruction numbered four, which is in these words:

"The court instructs the jury that, in considering the weight to be given to the evidence of the witnesses in the case, they

may consider the question as to whether or not any of them are in the employ of the defendant company, and whether or not they or any of them are influenced by their relations to it, and to what extent."

The objection urged to this instruction is that whilst fourteen out of the fifteen witnesses introduced by the defendant were its employees, no evidence was offered to show that any of them had any interest whatever in the result of the suit, or that their testimony would be in any way influenced by their relation to the defendant, yet the court, in effect, assumed by the latter clause of its instruction that the mere fact that they were in the service of the defendant rendered their evidence less worthy of credence.

We do not think the instruction is subject to the criticism made upon it, yet as the jury is the sole judge of the credibility of witnesses, and as it is of the utmost importance that the judge, in giving instructions involving that question should not trench upon their province, it would have been better to have said to the jury generally, without going into details, that, in passing upon the testimony of all the witnesses, they had the right to take into consideration their relation, if any, to the parties, or to either of them.

In discussing this subject, Judge Thompson, in his work on Trials, Vol. 2, sec. 2420, well says that "the danger of trespassing upon the exclusive province of the jury, in giving instructions, is so great, and the catalogue of what the judge *ought not* to do under the head so extensive, that we may conclude by quoting an observation of the Supreme Court of Alabama: 'There are so many considerations affecting the credibility of a witness that it is far better and more promotive of the ends of justice, to leave the jury free in each case to determine, in view of all the circumstances, the witnesses whom they will credit, or the parts of the evidence of any witness which they will credit and

which they will discredit, than to fetter their judgment by in-flexible rules which may compel them to conclusions which they would not otherwise reach.' "

The judgment complained of must be reversed, the verdict set aside, and the cause remanded for a new trial.

*Reversed.*