# United States Court of Appeals for the Federal Circuit

04-1572

MICROSTRATEGY INCORPORATED,

Plaintiff-Appellant,

v.

BUSINESS OBJECTS, S.A. and BUSINESS OBJECTS AMERICAS, INC.,

Defendants-Appellees.

Carter G. Phillips, Sidley Austin Brown & Wood, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Kathi A. Cover and Brian T. Fitzpatrick.

Daniel J. Furniss, Townsend and Townsend and Crew LLP, of Palo Alto, California, argued for defendants-appellees. With him on the brief were Gary H. Ritchey and Joseph A. Greco. Of counsel were Dana Johannes Finberg, LeClair Ryan, of Richmond, Virginia, and Robert D. Luskin, Patton Boggs LLP, of Washington, DC.

Appealed from: United States District Court for the Eastern District of Virginia

Judge Jerome B. Friedman

# United States Court of Appeals for the Federal Circuit

04-1572

MICROSTRATEGY INCORPORATED,

Plaintiff-Appellant,

v.

BUSINESS OBJECTS, S.A. and BUSINESS OBJECTS AMERICAS, INC.,

Defendants-Appellees.

_____

DECIDED:  November 17, 2005

_____

Before NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

MicroStrategy and Business Objects are competitors in the field of business intelligence software.  MicroStrategy initially sued Business Objects, S.A., a French corporation, and Business Objects Americas, Inc. (collectively Business Objects), its wholly-owned American subsidiary, in the United States District Court for the Eastern District of Virginia for infringement of MicroStrategy's U.S. Patent No. 6,260,050 (the '050 patent) and U.S. Patent No. 6,270,033 (the '033 patent).  MicroStrategy later amended its complaint to add four business tort claims stemming from the hiring of several MicroStrategy employees by Business Objects.  Although a trial took place on some claims, the district court ultimately disposed of both the patent claims and business tort claims without a jury verdict.  For separate reasons on each issue, this court affirms the district court on all matters, except one.  Because the district court

erroneously determined that Virginia law would not acknowledge MicroStrategy's contractual non-solicitation clause, this court reverses on that issue and remands for further proceedings consistent with this opinion.

I.

This court reviews the grant or denial of a motion for judgment as a matter of law (JMOL) "under the law of the regional circuit where the appeal from the district court normally would lie." Riverwood Int'l Corp. v. R.A. Jones & Co., 324 F.3d 1346, 1352 (Fed. Cir. 2003). Under the law of the United States Court of Appeals for the Fourth Circuit, this court reviews the denial of a motion for judgment as a matter of law without deference. Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 431 (4th Cir. 2004). "We must view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [the non-movant's] favor without weighing the evidence or assessing the witnesses' credibility." Id. "The question is whether a jury, viewing the evidence in the light most favorable to [the nonmovant], could have properly reached the conclusion reached by this jury." Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001). "We must reverse [the denial of a motion for JMOL] if a reasonable jury could only rule in favor of [the movant]; if reasonable minds could differ, we must affirm." Id.

This court reviews the district court's grant or denial of summary judgment under the law of the regional circuit. Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1191 (Fed. Cir. 2004). Under the law of the Fourth Circuit, this court reviews the grant or denial of summary judgment without deference. Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 268 (4th Cir. 2002).

This court reviews a district court's evidentiary rulings under the law of the regional circuit. Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed. Cir. 2004). Under the law of the Fourth Circuit, this court reviews the district court's exclusion of evidence for an abuse of discretion. United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996).

II.

With respect to the patent claims, MicroStrategy voluntarily dismissed its infringement claim on the '030 patent before trial. On the '050 patent, however, the district court granted summary judgment of non-infringement in favor of Business Objects. The district court reached this result after interpreting the claims to require an association of output devices with a "device-specific style" on a device-by-device basis. See MicroStrategy, Inc. v. Business Objects, S.A., 331 F. Supp. 2d 432 (E.D. Va. Aug. 6, 2004) (Patent Judgment). This court agrees with the district court's construction.

The '050 patent is directed at a system and method for automatic broadcasting of information to multiple types of subscriber output devices and formatting output for those devices using configurable parameters. '050 patent, col. 1, ll. 26-32. The invention allows companies to access and mine enormous volumes of data generated by their business operations. The '050 patent gives some idea of the problems addressed by the invention:

> The availability of large volumes of data presents various challenges. One challenge is to avoid inundating an individual with unnecessary information. Another challenge is to ensure all relevant information is available in a timely manner.

'050 patent, col. 1, ll. 39-44. The '050 patent further specifies that the data must be available to "multiple types of subscriber output devices, including electronic mail, personal digital assistants (PDA), pagers, facsimiles, printers, mobile phones, and telephones." Id., col. 1, ll. 28-31. The parties dispute whether, as claimed, the system and method must associate these various output devices with a "device-specific style" on a device-by-device basis. Moreover if each device – printer, pager, etc. – requires its own presentation style, this requirement suggests that the invention also requires support for multiple types of output devices. Claim 8 is representative of the disputed language; it reads:

> 8. A method for generating output from an on-line analytical processing system to user output devices comprising the steps of:
>
> processing at least one scheduled service in an on-line analytical processing system according to a schedule established for the service and generating a service output, each service comprising at least one query to be performed by the on-line analytical processing system and at least one user device subscribed to that service;
>
> enabling a plurality of subscribers to subscribe to the scheduled service and enabling the subscriber to specify at least one user output device at which to receive service outputs from the service;
>
> wherein <u>each user device subscribed to that service is associated with a **device-specific style**</u> that designates the format in which that particular type of user device is to output to the service outputs to a user to maintain the integrity of the service outputs;
>
> determining whether to forward the generated output to one or more user devices based on output conditions specified for each user device subscribed to the service;
>
> creating a <u>**device-specific formatted output**</u> for each user device subscribed to the service selected to receive the output according to a selection of predefined values specified for each of a plurality of predefined parameters provided by the style specified for the user output device, and

automatically forwarding a device-specific formatted service output to each of the user output devices selected to receive the output for that service;

wherein the determining step comprises determining whether each user device subscribed to the service is an alert subscription or a periodic subscription and selecting the user device if it is a periodic subscription or if an alert condition specified in the alert subscription has been satisfied.

Id., col. 18, l. 51-col. 19, l. 21 (emphases added).

The district court first construed the term "device-specific style" during a Markman proceeding. During that proceeding, MicroStrategy argued that the term meant "[o]ne or more parameters that designate the format in which a particular type of output device receives service outputs." After a careful review of the claim language and relevant statements in the specification and file wrapper, the district court largely adopted MicroStrategy's proposed definition. Thus, the district court construed "device-specific style" to mean "[t]he format in which a particular type of output device receives and displays service output, consisting of values of a plurality of parameters." MicroStrategy, Inc. v. Business Objects, S.A., Civil Action No. 2:01cv826, slip op. at 27 (E.D. Va. Mar. 18, 2004) (Claim Construction Order).

The district court construed the remaining claim language on summary judgment. Patent Judgment, 331 F. Supp. 2d at 439. Based on the claim language, the district court "conclude[d] . . . that the system or method [must] function on a device-by-device basis." Id. at 440. The district court's interpretation focused on two aspects common to the three independent claims: "(1) *each* user device is *associated* with a device-specific style, and (2) output is created for *each* user device according to the style *specified for* the user output device." Id. (emphasis in original). Thus, the district court concluded that the claim language requires association of output devices with a device-specific

style on an individual, device-by-device basis.  Id.  In other words, the invention requires a particular format and presentation for one device, e.g. mobile phone data, that could differ from the format for a second device, e.g., electronic mail data.  The district court summarized its conclusion as follows:

> [T]he patent covers methods and systems that retain associations between individual devices and device styles . . . because only in that manner does the patent cover systems that handle multiple device types or customization of subscription features on a subscriber-by-subscriber or device-by-device basis.  . . .  While it is not necessary that the devices always be different, the system or method described in the claims is structured to facilitate the transmission of the same output to multiple device types.

Id. at 442-43.

This court recently restated: "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."  Id.  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id.

All three of the '050 patent's independent claims recite the term "device-specific style."  As previously noted, the district court construed this term as part of its Markman proceedings to mean "[t]he format in which a particular type of output device receives and displays service output, consisting of values for a plurality of parameters."  Claim Construction Order, slip op. at 27.  This construction accurately reflects the claim

language and the context supplied by the specification. <u>See</u> '050 patent, col. 4, ll. 49-63.

While accepting the district court's Markman construction, the parties dispute its meaning. MicroStrategy argues that this Markman construction and the context of the invention do not require support for more than one type of output device. In particular, MicroStrategy notes that the specification contemplates a system with "one or more" output devices. <u>See</u> <u>id.</u>, col. 5, ll. 4-6. Thus, MicroStrategy reads the claim and the district court's Markman construction to permit a system with support for just one type of user device.

To the contrary, as noted in the district court's summary judgment order, all three independent claims require that *each* user output device subscribed to a service be *associated* with a *device-specific style*. <u>See</u> <u>id.</u>, col. 17, ll. 58-62; col. 18, l. 65-col. 19, l.2; col. 20, ll. 21-25. The term "associated" implies that the system creates a link between user output devices and corresponding "styles." In other words, the system must identify and track in some manner the "style" in which a particular user output device receives and displays output. This claim language further requires a direct link between each user output device, *individually*, and a corresponding "device-specific" style.

In addition, the claims require a device-specific formatted output according to a style *specified* for *each* device. <u>See</u> <u>id.</u>, col. 17, l. 66-col. 18, l.10; col. 19, ll. 6-11; col. 20, ll. 30-35. As noted by the district court, the words "specified" and "each" reaffirm that these claims require individual, device-by-device association. Moreover, the ultimate creation of a "device-specific" format requires at least two different device-

specific styles. Otherwise, the references in the claims to individualized, device-by-device association of styles with user output devices and corresponding creation of a device-specific formatted output would be meaningless.

The specification supports this construction as well. The specification reads:

> According to one embodiment of the present invention, a system for automatically generating output from an on-line analytical processing system based on scheduled services specified by subscribers of the system is provided. The system processes scheduled services in an on-line analytical processing system with each service comprising at least one query to be performed by the on-line analytical processing system. The system then automatically forwards output from the services to **one or more subscriber output devices** specified for that service. Users may define new services, including the schedule of the services and the type, such as alert services or scheduled services, and may also subscribe to the services provided by the system. . . . The output devices the system may forward output to may comprise electronic mailbox, facsimile, printer, mobile phone, telephone, pager, PDA or web pages.

Id., col. 4, l. 64-col. 5, l. 22 (emphases added).

While this paragraph does state the system may ultimately forward output to only "one" output device, it does not address at all a minimum capacity to support a number of output formats (e.g., only one). Instead, this paragraph is open to an interpretation requiring support for multiple types of subscriber output devices, see id., col. 5, ll. 19-22, even though, in practice, all the subscribers may receive their subscription via only one format (e.g., e-mail or another suitable format). Therefore, this paragraph does not conflict with a claim construction requiring support for multiple device types or an association of styles with devices on an individual, device-by-device basis. The district court read the specification correctly in its well-reasoned decision. See Patent Judgment, 331 F. Supp. 2d at 443 (commenting that, while the system must be structured to support multiple device types, in operation, it is not necessary for the output devices to be different). In sum, based on the claim language in proper context

and the specification that supplies much of that context, the district court correctly interpreted the claims.

The district court then turned correctly to analyze Business Object's accused product, i.e. the Broadcast Agent Publisher (Publisher). "[I]nfringement is assessed by comparing the accused device to the claims[;] the accused device infringes if it incorporates every limitation of a claim, either literally or under the doctrine of equivalents." Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1732 (Fed. Cir. 2005). If, however, even one claim limitation is missing or not met, there is no literal infringement. Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998).

In this case, the district court concluded that Publisher does not contain each of the limitations of the asserted claims:

> In Publisher, users are subscribed to "publications," which are similar to [the] services [disclosed in the '050 patent]. A publication is a "broadcast" of information to a group of "recipients." The creator of the publication determines who is a recipient of the publication and when it is sent. The publication sent to a recipient is simply information obtained through a query or queries on a database. The Publisher software is only designed to be run with email. In other words, the recipient output device is simply an email address. There are, however, several different formatting options for such email, depending upon the type of email server employed.

See Patent Judgment, 331 F. Supp. 2d at 437. As noted by the district court, Publisher "does not make any association between the [output] devices and the format. The system does not know what the devices are or the styles that each device needs to properly receive and display output." Id. at 439-40. Rather, "[i]t only supports one style per publication." Id. at 443. Thus, Publisher does not provide an association between devices and device-specific styles on a device by device basis as required by the

court's claim construction. For at least this reason, the district court properly concluded that Business Objects does not literally infringe.

The district court further determined that MicroStrategy could not "rely on the doctrine of equivalents to prove infringement" because MicroStrategy's expert "failed to [opine] in a sufficient manner regarding the doctrine of equivalents." Id. at 445 (citing Zelinshi v. Brunswick Corp., 185 F.3d 1311 (Fed. Cir. 1999) (finding a conclusory statement by a patent attorney expert insufficient to prove infringement under the doctrine of equivalents)). Because MicroStrategy does not challenge this finding on appeal, this court need not address infringement by equivalents.

In brief, the district court properly construed the disputed claim terms and properly concluded that Business Object's Publisher product cannot infringe. Accordingly this court affirms the district court's grant of summary judgment of non-infringement.

III.

On MicroStrategy's four business tort claims, the district court disposed of much of the dispute with various evidentiary rulings that excluded MicroStrategy's evidence on damages and causation. MicroStrategy's tort case relied heavily on the presentation of its damages expert, David E. Yurkerwich,[1] and his three expert reports (collectively referred to as "the expert reports"). These three expert reports, however, were excluded primarily due to a flawed methodology that rendered them speculative and unreliable. MicroStrategy's tort case also relied on non-expert damage theories that

---

[1] According to Yurkerwich's initial expert report, he is a managing director and chairman of InteCap, Inc., an international consulting firm related to intellectual property and complex commercial disputes.

were excluded due to a failure to timely supplement discovery interrogatories. As discussed below, the district court did not abuse its discretion in making these evidentiary rulings.

The district court first excluded Yurkerwich's initial expert report, dated July 17, 2002, due to the use of a flawed methodology. The district court found that the initial expert report did not consider relevant factors in its damages analysis, and did not link any single instance of misconduct to a specific amount of damages. MicroStrategy, Inc. v. Business Objects, S.A., Civil Action No. 2:01cv826, slip op. at 5-9 (E.D. Va. Dec. 2, 2002) (Exclusion Order). While Yurkewich later attempted to supplement that initial expert report, the district court excluded the additional information as well because it contained the same flawed methodology. Moreover, the "supplement" contained new opinions and doubled the amount of damages, which prevented it from filling the role of a true supplement to a previously filed report. Thus, Yurkerwich's second expert report was untimely, having been filed in violation of the district court's scheduling order and not being a true supplement to the initial report. Id., slip op. at 14-19. Finally, the district court refused to allow MicroStrategy to submit a third expert report (the "revised" report) because, yet again, it contained the same flawed methodology as the initial expert report and the supplement, and because it was filed in violation of the district court's scheduling order. Id., slip op. at 19-21. Without reports to support any testimony, the district court refused to allow Yurkerwich to testify at trial. These evidentiary rulings (collectively referred to as "the expert rulings") left MicroStrategy with little evidence of damages or causation.

04-1572                                          11

These expert rulings alone, however, do not tell the complete story. Rather, at trial, the district court also prevented MicroStrategy from introducing its non-expert damages theories because MicroStrategy had not supplemented discovery interrogatories. The combined effect of the expert rulings and the exclusion of MicroStrategy's non-expert damages theories left MicroStrategy with little or no evidence of damages or causation.

A brief summary of MicroStrategy's financial problems sets the scene for review of the district court's exclusion orders. During the "dot com" bubble burst of the late 1990s, MicroStrategy began to suffer severe financial problems. A major accounting error, however, exacerbated MicroStrategy's problems and required a downward readjustment of its 1997, 1998, and 1999 earnings reports. Exclusion Order, slip op. at 2. In the aftermath, MicroStrategy's stock plummeted 62% in one day, eventually falling from a high of $313 per share to a low of 49 cents per share. The company also faced a U.S. Securities & Exchange Commission (SEC) investigation and a series of class action law suits. Id. As MicroStrategy fought to remain solvent, it laid off two thirds of its workforce and cut its sales and marketing budget in half. Id. MicroStrategy's chief executive officer (CEO) summed up this period in three words: "It was painful."

With this backdrop, the district court properly identified the shortcomings in MicroStrategy's expert reports. Confronted first with the initial expert report, the district court properly concluded that, despite the rather obvious role that MicroStrategy's financial instability played in the company's ongoing struggles, Yurkerwich attributed all of the company's post 2000 losses solely to the alleged tortious conduct by Business Objects. No wonder that the district court found that the expert report did not link a

single misconduct to a specific injury. See Tr. of Pending Mot., No. 2:01cv826 at 43 (E.D. Va. Sept. 19, 2002).[2]

MicroStrategy claims that Yurkerwich accounted for these grave market set-backs by selecting the year 2000 as his baseline. However, while the last year of the downward adjustment of income was indeed 1999, Yurkerwich provided no basis for assuming that *all* of MicroStrategy's financial struggles and corporate restructuring, which were far reaching in scope and breadth, had no lingering effects beyond 1999. The record contained no indication that these economic set-backs had no effect in 2000 and thereafter. Moreover, even if those set-backs could be contained in the period prior to 2000, Yurkerwich's report also did not account for several other major factors, such as the introduction of new products by Business Objects. In brief, Yurkerwich's report ignored any significant factor that might have attributed MicroStrategy's difficulties to factors other than the torts. Thus, the district court properly perceived that Yurkerwich's report did not accurately link the alleged damages to the torts. Instead the record suggests that other market factors caused most, if not all, of the damage to MicroStrategy, which highlights the need for reliable proof of the specific amount attributable to the alleged tortious acts.

In the direct, but supportable, terms of the district court, "[t]his report does not pass the red face test. It does not pass the Daubert test. It does not pass the Rule 702 test. . . . I read the report before I read any of the briefs, and I, frankly, was appalled at

---

[2]    The evidentiary rulings initially were ordered by Magistrate Judge Tommy E. Miller, who presided over various portions of the trial below. All of Judge Miller's rulings were upheld by District Court Judge Friedman on appeal. Thus, the rulings of both Judge Miller and Judge Friedman are collectively referred to as "the district court's rulings" for purposes of this opinion.

it." Id. Exercising its gatekeeper role, the district court properly excluded the initial expert report on this basis. Exclusion Order, slip op. at 8.

The rule in the Fourth Circuit that an expert need not consider every possible factor in rendering an opinion does not provide a basis for finding that the district court abused its discretion in excluding the initial expert report. See Westbury v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999) (holding that an expert's conclusions "should not be excluded because he or she has failed to rule out every possible alternative cause."). This court does not read its sister circuit's rule to eliminate the district court's obligation to weigh the admissibility of expert evidence. The Fourth Circuit does not mean that an expert's testimony is admissible so long as the expert is qualified, even if the expert's basis for rendering the opinion in question is speculative and unreliable, if not groundless. To the contrary, the district court has an obligation to weigh the admissibility of expert evidence under the Federal Rules. "[U]nder the [Federal] Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 589 (1993). While an expert need not consider *every* possible factor to render a "reliable" opinion, the expert still must consider *enough* factors to make his or her opinion sufficiently reliable in the eyes of the court. See United States v. Barnette, 211 F.3d 803, 815 (4th Cir. 2000) ("The trial judge must ensure that the evidence is based on scientific knowledge, or is reliable, and ensure that the evidence will assist the trier of fact, or is relevant.") (citing Daubert, 509 U.S. at 592); United States v. Prince-Oyibo, 320 F.3d 494, 498 (4th Cir. 2003) (A trial court must ensure expert testimony is both reliable and relevant.); United States v. Hammoud, 381 F.3d

316, 337 (4th Cir. 2004) (en banc) vacated on other grounds, 125 S.Ct. 1051 (2005) ("In determining whether proffered expert testimony is reliable, the district court has broad discretion to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved.") (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152-53 (1999)); United States v. Cruz, 363 F.3d 187, 192 (2nd Cir. 2004) (The court must evaluate whether proffered testimony has a sufficiently reliable foundation to permit it to be considered.).

This pre-admission determination (i.e., whether or not *enough* factors have been considered to make an expert report *sufficiently* reliable) is committed to the sound discretion of the district court, *not* the jury. See Hammoud, 381 F.3d at 337; Westbury, 178 F.3d at 261; Prince-Oyibo, 320 F.3d at 499. Stated simply, an expert need not consider every possible factor. At the same time, the district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative.

In this case, the record shows that the excluded expert report did not link a single loss to a specific misconduct and ignored significant factors that might have excluded the torts as the reason for the losses. For these reasons, the district court was well within its discretion to exclude it.

As to the supplement and revised report, the district court also excluded these reports because they both suffered from the same flawed methodology as the initial expert report. See Exclusion Order, slip op. at 18-19, 21. While challenging those flaws, MicroStrategy admits that the supplemental and revised reports use the same

basic methodology and base data as the initial July Report. See id., slip op. at 21. Because this court affirms the district court's exclusion of the initial report due to its flawed methodology, this court affirms the district court's exclusion of the supplemental and revised reports as well. This court need not address whether the supplement or revised report were timely filed.

The district court also acted within its discretion in preventing Yurkerwich from testifying at trial. See id., slip op. at 9-12. Specifically, Rule 702 of the Federal Rules of Evidence allows for the testimony of an expert witness if:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (effective Dec. 1, 2000). In this case, the district court determined that Rule 702 was not satisfied, in part, because Yurkerwich's principles and methods, as disclosed in his three expert reports, were speculative and unreliable. For this reason alone, the district court was well within its discretion to prevent Yurkerwich from testifying.

This court is aware of the Fourth Circuit's rule in Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592 (4th Cir. 2003), discussing whether exclusion of testimony is an appropriate sanction for a late disclosure to the opposing party. MicroStrategy argues that because Yurkerwich's testimony is supported by his supplement and revised report, under Southern States his testimony is admissible even if these reports were untimely. The Southern States precedent might apply to some degree if the only reason for excluding Yurkerwich was a tardiness concern. In this case, however, the district court excluded all of MicroStrategy's expert evidence, in part, due to its flawed methodology. Thus Southern States simply does not apply.

The district court also acted within its discretion in excluding MicroStrategy's non-expert damages theories for failure to supplement discovery interrogatories. Specifically, during the discovery process, Business Objects served an interrogatory on MicroStrategy that required MicroStrategy to identify its damages theories and the factual basis and methodology for its calculations. At trial, MicroStrategy sought to introduce evidence of damages not disclosed in response to that interrogatory. Therefore, the district court excluded the evidence under Rule 37(c)(1) of the Federal Rules of Civil Procedure.

MicroStrategy now presents three arguments as to why the district court abused its discretion in excluding its non-expert damages theories: (1) a supplemental interrogatory response filed on Oct. 7, 2002 sufficiently disclosed the new damage theories; (2) even if the Oct. 7, 2002 supplement did not sufficiently disclose it, the evidence should not have been excluded under the Southern States exclusion test; and (3) Business Objects did not properly object to introduction of the evidence when it was introduced. Not one of these theories is persuasive.

MicroStrategy's first argument directly contradicts statements made at trial, acknowledging no supplements incorporating the non-expert damages evidence were ever filed. Specifically, MicroStrategy sought to excuse its failure to supplement because they had relied on their expert report which the district court excluded on the eve of trial and left no time to supplement the interrogatory responses again:

THE COURT:     You made reference to the [expert] report . . . which is
               no longer relevant to this particular case
Mr. MOLL:      Hm-hmm
THE COURT:     You never supplemented your answers

Mr. MOLL:  No, we didn't, because again, the procedural posture of this was, the [expert] report had been submitted at the time

Based on this exchange (and others in the record), this court must acknowledge MicroStrategy's repeated admissions that it did not properly supplement their answers to Business Objects' discovery interrogatories.

As to MicroStrategy's second argument, under the Fourth Circuit's <u>Southern States</u> test, the trial court applies a five-factor test to justify harmless nondisclosure of evidence:

> (1) the surprise to the party against whom the witness was to have testified;  (2) the ability of the party to cure that surprise;  (3) the extent to which allowing the testimony would disrupt the trial;  (4) the explanation for the party's failure to name the witness before trial;  and (5) the importance of the testimony.

<u>Southern States</u>, 318 F.3d at 596 (internal quotation marks omitted).  Applying these factors to the present case, the nondisclosure of MicroStrategy's non-expert damages theories was neither substantially justified nor harmless.  For example, the record shows that MicroStrategy's new theories surprised Business Objects on the eve of trial and prejudiced any response.  MicroStrategy could not cure the surprise without postponing trial and reopening discovery.  Moreover, the record shows that most of the information MicroStrategy sought to introduce was in its possession for over a year before trial.  While this exclusion admittedly left MicroStrategy without evidence of damages or causation for most of its business tort claims, this factor is only one of five that does not tip the scale in favor of MicroStrategy, particularly where MicroStrategy alone is to blame for creating this situation.  Thus, this court cannot say the district court abused its discretion in excluding the new damages theories under the Fourth Circuit's <u>Southern States</u> test.

Finally, the record shows that Business Objects properly objected to introduction of the evidence:

> THE COURT: Aren't we really getting to one of the main issues in this case, as to whether or not you all frankly have answered interrogatories appropriately so that there would be any element of damages in this particular case?
> . . . .
> THE COURT: I mean I'm really, really concerned about it. I haven't seen a brief yet from you either.
> MR. MOLL: Your Honor, I have –
> THE COURT: In response to [Business Object's] brief.
> MR. MOLL: I apologize for that. I have four people here –
> THE COURT: I understand that.
> MR. MOLL: – I have people that were up all night trying to do things and have things right, and I apologize that it wasn't ready.

As demonstrated by these transcripts, Business Objects objected in understandable terms to the introduction of this evidence and even filed a brief to protest introduction of the new damage theories before trial. Thus, this court rejects MicroStrategy's third argument as well.

In sum, this court perceives no abuse of discretion in the district court's exclusion of MicroStrategy's expert reports and expert testimony. Nor does this court perceive an abuse of discretion in the district court's exclusion of MicroStrategy's additional non-expert damage theories. Thus, the district court's evidentiary rulings must be affirmed.

IV.

Turning now to the merits of MicroStrategy's four business tort claims, MicroStrategy's first business tort claim involves misappropriation of trade secrets. The district court tried this issue without a jury. The district court examined eighteen instances where Business Objects had received MicroStrategy information, and determined that only two actually involved misappropriation of trade secrets.

MicroStrategy, Inc. v. Business Objects, S.A., 331 F. Supp. 2d 396, 421-29 (E.D. Va. 2004) (Trade Secret Judgment) (see discussion of the "Business Objects Competitive Recipe" and the "Volume Discount Schedule"). For the trade secret information in Business Objects' possession, the district court promptly issued an injunction against its further use. Id. at 430-31. The parties do not dispute the district court's findings in this regard. Thus, this court does not address the propriety of these findings.

The district court did not, however, award damages to MicroStrategy because, prior to trial, the district court granted partial summary judgment on damages in favor of Business Objects on the grounds that MicroStrategy did not "show the amount of damages . . . sustained with reasonable certainty" or "a causal connection between the damages it suffered and the actions of [Business Objects]." MicroStrategy, Inc. v. Business Objects, S.A., Civil Action No. 2:01cv826, slip op. at 8 (E.D. Va. Dec. 30, 2002) (Partial Summary Judgment Order). MicroStrategy challenges this grant of partial summary judgment on appeal, arguing that the district court improperly excluded its evidence on damages and causation.

Having already concluded in the preceding section that the district court's evidentiary rulings were proper, this court affirms the district court's related grant of partial summary judgment of damages on this claim to Business Objects. What little evidence the district court did not exclude was simply insufficient to show causation or damages with any reasonable certainty.

V.

MicroStrategy's second business tort claim, tortious interference with contract, has two aspects. The first aspect involves a non-solicitation clause in MicroStrategy's

employee contract. The district court declared this clause invalid and unenforceable as a matter of Virginia law in a summary judgment order. See MicroStrategy, Inc. v. Business Objects, S.A., 233 F. Supp. 2d 789, 795 (E.D. Va. 2002) (Non-solicitation Judgment). The second aspect involves a confidentiality clause in the same employee contract. The district court granted JMOL to Business Objects on this aspect of the claim due to MicroStrategy's failure to show that the purported tortious interference was a proximate cause of the claimed damages. As discussed below, because MicroStrategy failed to provide any evidence showing that Business Objects' purported interference with the "confidentiality clause" in the employee agreement was the proximate cause of its claimed damages, the grant of JMOL on this aspect of the tortious interference with contract claim is affirmed. However, because the non-solicitation clause in the agreement is valid under Virginia law, the grant of summary judgment of unenforceability of this clause is reversed.

### The Non-solicitation Clause

The non-solicitation clause in the employee contract reads:

> I agree that, for the period of one (1) year after termination of my employment with MicroStrategy for any reason, I will not, directly or indirectly, seek to influence any employees, agents, contractors or customers of MicroStrategy to terminate or modify their relationship with MicroStrategy.

Non-solicitation Judgment, 233 F. Supp. 2d at 794. The district court found the words "indirect," "influence," "modify," and "relationship" ambiguous, rendering the clause invalid under Virginia law. Id. at 795. Later, a Virginia state court disagreed, and upheld the very same provision as *valid* under Virginia law. See MicroStrategy, Inc. v. Egrail, Inc., No. 177631 (Va. Cir. Ct. June 20, 2003) (State Court Decision). Thus, this

court confronts a conflict between a federal district court and a Virginia state court on purported ambiguity in this Virginia contract.

As a preliminary matter, when a state court has decided a matter of state law, as in the present case, federal courts should pay careful attention to the state court decision. See Litton Indus. Prod., Inc. v. Solid State Sys., Corp., 755 F.2d 158, 165 (Fed. Cir. 1985) ("If there is no decision by the state's highest court, proper regard should be given relevant rulings of other courts of that state.") (citation omitted); In re Byrd, 357 F.3d 433, 438 (4th Cir. 2004) ("A state court judgment is not to be treated lightly, particularly where it interprets state law.") (citing Nat'l Bank of Wash. v. Pearson, 863 F.2d 322, 327 (4th Cir. 1988) (deferring to state trial court's interpretation of state law)). However, the state court decision is not binding on a federal court unless rendered by the state's highest court. See Derungs v. Wal-Mart Stores, Inc., 374 F.3d 428, 433 (6th Cir. 2004) ("If the state supreme court has spoken on the issue, its decision should be followed; if, however, the only precedent is from the state's intermediate appellate courts, the intermediate court's decision should be followed absent a strong showing that the state supreme court would act in a different manner.") (citations omitted); Johnson v. Riddle, 305 F.3d 1107, 1118 (10th Cir. 2002) ("When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule.") (citations omitted). Because in this case a Virginia circuit court (i.e., not the Virginia Supreme court) rendered a decision contrary to the federal district court, this court accords the state decision respect but is not bound to follow it.

In Virginia, the ambiguity of contract language is a question of law subject to de novo review. Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631 (2002). Virginia enforces restrictive covenants if reasonable. Non-Solicitation Judgment, 233 F. Supp. 2d at 794 (citing Foti v. Cook, 220 Va. 800, 805 (1980)). A three-part test determines reasonableness in Virginia:

> (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than necessary to protect the employer in some legitimate business interest?; (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?; [and] (3) Is the restraint reasonable from the standpoint of a sound public policy?

Id. (quoting Alston Studios, Inc. v. Lloyd V. Gress & Assocs., 492 F.2d 279, 282-83 (4th Cir. 1974) (citing Meissel v. Finley, 198 Va. 577 (1956))). Because of the ambiguity, the district court determined that the clause violated all three parts of the test. For example, the district court hypothesized: "A former employee of the plaintiff has no real yardstick to measure what actions would influence a customer to modify its relationship with MicroStrategy and cause him or her to be in violation of the clause." Id. (emphasis added).

> The state court, however, disagreed:

> My admiration for the federal court, and Judge Friedman knows no bounds. Of course, this Court's not constrained by those opinions, and quite frankly, I think Judge Friedman was straining at nats on paragraph five here.

> I don't find the ambiguity that he finds. I certainly agree that all of these cases are fact dependent. But this is a facial attack and I find facially that this does not violate Virginia law. I think it's not ambiguous.

> [The agreement] says [the former employee] will not seek to influence any employees or agents or contracts or customers to terminate or modify their relationship with Microstrategy. I don't see how it can be much clearer.

04-1572                                    23

State Court Decision, at 18-19.

Upon review of the district court, this court perceives no invalidating ambiguity under Virginia law. The contract is not ambiguous on its face. Rather the language prohibits former employees from taking any action that drives MicroStrategy customers away altogether or prompts a MicroStrategy customer to buy less (but still some) from the company. The words "influence," "modify," and "relationship" in context convey this meaning. Under the clause, an employee promised to refrain from "influencing" MicroStrategy "employees, agents, contractors, or customers." The term "influencing" conveys the meaning of altering or affecting the business conduct of the named parties. The term "modify," particularly when placed next to the words "terminate or," conveys the concept of altering or affecting business conduct in some way short of complete termination of relationships with MicroStrategy. Finally, the term "relationship" in this context conveys the meaning of business conduct, whether that of an employee, agent, contractor, or customer, as specified earlier in the contractual clause. The court perceives no fatal ambiguity in this broad, but straight-forward terminology. Moreover, the "direct or indirect" clause does not render the claim ambiguous. See Foti, 220 Va. at 434 (upholding a solicitation clause that prohibited former employees from "soliciting and accepting employment *directly or indirectly* from the appellant's clients.") (emphasis added).

In sum, this court concludes that the district court erred in finding the non-solicitation clause invalid and unenforceable as a matter of Virginia law. This court accordingly remands this aspect of the tortious interference with contract claim to the district court for further proceedings. This court is aware that MicroStrategy will have

difficulty in showing any damages associated with this claim. Nonetheless this court remands to permit the district court to consider this issue further.

<u>The Confidentiality Clause</u>

The confidentiality clause in MicroStrategy's employee contracts reads:

> I agree that I have no right to use for the benefit of myself or anyone other than MicroStrategy, any of the Confidential Information of MicroStrategy or MicroStrategy's Business Partners of which I become informed during my employment, whether or not developed by me. . . . Upon termination of my employment, I shall promptly deliver to MicroStrategy all Confidential Information which is in my possession or under my control.

The district court allowed the confidentiality clause claim to go to trial, but, at the close of MicroStrategy's case in chief, granted JMOL to Business Objects.

Under Virginia law, a party may sue for tortious interference with contract because "the right to performance of a contract and the right to reap profits therefrom are property rights which are entitled to protection in the courts." <u>Chaves v. Johnson</u>, 230 Va. 112, 120 (1985) (quoting <u>Worrie v. Boze</u>, 198 Va. 533, 536 (1956)). However, the plaintiff must show:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

<u>Id.</u> (citing <u>Calbom v. Knudtzon</u>, 65 Wash. 2d 157, 162-63 (1964)). MicroStrategy's tortious interference claim is deficient in the fourth element. The district court determined that MicroStrategy did not provide sufficient evidence to allow a reasonable jury to conclude that Business Objects' acts were the proximate cause of any damage. As noted earlier, MicroStrategy did not account for other potential causes for its loss of business and Business Objects' gain in business over the same period (e.g.,

MicroStrategy's significant financial problems and Business Objects' introduction of new products).

"The proximate cause of an event is that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." Atkinson v. Scheer, 256 Va. 448, 454 (1998) (quoting Beale v. Jones, 210 Va. 519, 522 (1970)). "[W]hen, as here, the defendant asserts the possibility of another cause for the plaintiff's injuries, the plaintiff's burden remains that of proving by a preponderance of the evidence that the defendant's acts were a proximate cause of the plaintiff's injuries." Honsinger v. Egan, 266 Va. 269, 275-76 (2003) (citing Norfolk & W. Ry. Co. v. Poole's Adm'r, 100 Va. 148, 154 (1902)). Thus, to show proximate cause, MicroStrategy need not exclude every other possible cause of its loss of business and Business Objects' gain in business. Id. (citing Wooldridge v. Echelon Serv. Co., 243 Va. 458, 461 (1992)). However, "[w]here the evidence shows that any one of several things may have caused the injury, for some of which defendant is not responsible, and leaves it uncertain as to what was the real cause, then plaintiff has failed to establish his case." Chesapeake & O. Ry. Co. v. Seay, 195 Va. 566 (1954) (quoting Kenny Co. v. Dennis, 167 Va. 417 (1937)).

In this case, the record shows multiple causes of MicroStrategy's loss of business and Business Objects' gain in business. Therefore, the district court correctly concluded that MicroStrategy must demonstrate the amount of damages attributable to Business Objects with reasonable certainty. See Techdyn Sys. Corp. v. Whittaker Corp., 245 Va. 291, 296 (1993) (commenting that where there is evidence of damages from multiple causes, the plaintiff must show the share attributable to the defendant with

reasonable certainty) (citations omitted); <u>Hale v. Fawcett</u>, 214 Va. 583, 586 (1974) (holding that summary judgment should not have been entered where the proof was too uncertain to allow a jury to apportion the damages); <u>Panther Coal Co. v. Looney</u>, 185 Va. 758, 771-72 (1946) (no recovery where the plaintiff has not shown to a reasonable certainty what share of the damages were caused by the defendant). Based on the evidence presented at trial, the district court properly concluded that MicroStrategy did not meet this burden in its case in chief.

MicroStrategy's evidence at trial emphasized that it suffered a loss in business during the same period that Business Objects obtained new business. From this temporal connection, MicroStrategy wanted the jury to infer that the purported tortious acts by Business Objects were the sole cause of its losses. Accordingly it sought an award of damages for the entire value of the business gained by Business Objects. Yet, the record contradicts this presentation. For example, MicroStrategy's Chief Operating Officer (COO) admitted at trial that the "principal determination or principal criteria [in convincing a new customer to buy software] is does the software actually provide value, does it do what the customer needs it to do technically." This testimony suggests that Business Objects' success during this period may have been partly or wholly attributable to its innovative products. In addition, the COO's testimony further suggests that MicroStrategy's loss of sales during this period may be attributable in part to the significant financial problems occasioned by its accounting errors. This testimony coupled with other entries in the record show that, as the district court correctly perceived, a reasonable jury would not be able to infer that the torts caused the damage alleged by MicroStrategy. The record does not support the vast inference

MicroStrategy invited.  Of course, this causation problem springs from the exclusion of MicroStrategy's expert reports and non-expert damages theories.  This court has already determined that the district court properly excluded that evidence under Daubert.

In brief, because MicroStrategy had the burden to prove causation and damages by preponderant evidence, this court finds that the district court properly granted JMOL to Business Objects at the close of MicroStrategy's case in chief.  See Carr v. Citizens Bank & Trust Co., 228 Va. 644 (1985) ("Where the loss results from several causes, the plaintiff must show within a reasonable degree of certainty the amount chargeable against a particular defendant. If the proof is too uncertain to allow a jury to apportion the part for which the defendant is responsible, the issue should not be submitted to the jury.") (internal citation omitted).

V.

MicroStrategy's third business tort claim involves violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The district court dismissed this claim on summary judgment because, again, MicroStrategy failed to show the amount of damage it suffered with reasonable certainty or a causal connection between the damages it suffered and the actions of Business Objects.  Partial Summary Judgment Order, slip op. at 6.  MicroStrategy does not challenge this grant of partial summary judgment on appeal.  Thus, this court does not address the propriety of this grant.

VI.

MicroStrategy's final business tort claim involves conspiracy to willfully and maliciously injure MicroStrategy in its trade, business, profession, and reputation (the

conspiracy claim) per Va. Code § 182.499. MicroStrategy pled this claim as predicated on a misappropriation of trade secrets. Partial Summary Judgment Order, slip. op. at 10. Because the Virginia Uniform Trade Secrets Act (VUTSA), Va. Code § 59.1-341(A), preempts claims predicated on a misappropriation of trade secrets, the district court granted summary judgment for Business Objects. This court agrees that the VUTSA preempts MicroStrategy's claim as pled.

The district court's interpretation of the VUTSA implicates the meaning of the term "other laws" in the preemption clause. Specifically, the VUTSA's preemption clause reads:

> A. Except as provided in subsection B of this section, this chapter displaces conflicting tort, restitutionary, and <u>other law</u> of this Commonwealth providing civil remedies for misappropriation of a trade secret.
> B. This chapter does not affect:
>   1. Contractual remedies whether or not based upon misappropriation of a trade secret; or
>   2. Other civil remedies that are not based upon misappropriation of a trade secret; or
>   3. Criminal remedies, whether or not based upon misappropriation of a trade secret.

Va. Code § 59.1-341 (emphasis added). The question before this court is simply whether or not the district court properly concluded that "other law" includes statutory causes of action. See Partial Summary Judgment Order, slip op. at 11 (citing Smithfield Ham & Prods. Co. v. Portion Pac, Inc., 905 F.Supp. 346, 348-49 (E.D. Va. 1995)). This court reviews the district court's interpretation of VUTSA without deference. Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1355 (Fed. Cir. 2003) (citing Waymark Corp. v. Porta Sys. Corp., 245 F.3d 1364, 1366 (Fed. Cir. 2001)).

"The starting point of every case involving construction of a statute is the language itself." Warner-Lambert, 316 F.3d at 1355 (quoting Blue Chip Stamps v.

Manor Drug Stores, 421 U.S. 723, 756 (1975)). "Moreover, we 'give effect, if possible, to every clause and word of [the] statute.'" Id. (quoting United States v. Menasche, 348 U.S. 528 (1955)). However, words of a statute are not to be interpreted in isolation; rather a court must look to the provisions of the whole law and to its object and policy. Id.; BlackLight Power, Inc. v. Rogan, 295 F.3d 1269, 1273 (Fed. Cir. 2002).

In this case, the VUTSA contains two sections that are to be read together in addressing the extent to which the act preempts other forms of relief. Section A broadly states that, *except as provided in subsection B of this section*, this chapter displaces conflicting tort, restitutionary, and "other law" of this Commonwealth providing civil remedies for misappropriation of a trade secret. See Va. Code § 59.1-341(A). Section B then proceeds to exclude all contractual and criminal remedies, whether or not based upon misappropriation of a trade secret, and those civil remedies that are *not* based upon misappropriation of a trade secret. See Va. Code § 59.1-341(B). When read together, sections A and B preempt *all* claims for relief, including both common law *and* statutory causes of action, if they provide a civil remedy for misappropriation of trade secrets *unless* they are contractual or criminal in nature. The district court properly analyzed this language in its opinion.[3]

---

[3] Contrary to this court's holding, one state court has held that the VUTSA does not preempt a statutory conspiracy claim. See Lockheed Martin Fed. Sys., Inc. v. Cincinnati Bell Info. Sys., Inc., 46 Va. Cir. 228, 1998 WL 972282 (Va. Cir. Ct. 1998). In Lockheed Martin, the court, without any explanation, stated "a claim for civil conspiracy under 18.2-499-500 of the Code of Virginia is not preempted by the Uniform Trade Secrets Act." Lockheed Martin, 1998 WL 972282, at *1. Lockheed Martin reached its conclusion in one sentence. This sketchy conclusion gives this court very little reasoning to consider and respect in its analysis. See Derungs, 374 F.3d at 433. To the extent that MicroStrategy relies on Lockheed Martin, this court concludes that the Virginia Supreme court would rule otherwise if faced with this issue.

The district court also properly concluded that the preemption clause barred MicroStrategy's claim as pled. Specifically, MicroStrategy argued that even if the VUTSA preempts statutory causes of action based upon misappropriation of trade secrets, courts have allowed parties to proceed with alternative claims until and unless the court can determine whether or not the facts demonstrate that misappropriation of trade secrets actually occurred. See Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) ("[U]nless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA."); Smithfield Ham, 905 F.Supp. at 351 ("Because Plaintiff has alleged two distinct common law theories of recovery which do not depend upon the misappropriation of a trade secret allegations, those claims are not preempted by the provisions of the VUTSA."). This court need not address such a theory, however, as the facts of this case are quite different from those in Stone Castle and Smithfield Ham. MicroStrategy specifically predicated its conspiracy claim on a misappropriation of trade secrets. Partial Summary Judgment Order, slip. op. at 10. Then, MicroStrategy set forth two theories that both depend upon the misappropriation of a trade secret, *not* a misappropriation theory and an independent and alternative conspiracy theory. Thus, MicroStrategy's pleading placed its claim under the heading of a misappropriation of trade secrets. The district court recognized this distinction, and properly found that, under these facts, the VUTSA preempted the conspiracy claim.

## VII.

In conclusion, because the district court properly disposed of the patent claim, the misappropriation of trade secrets claim, and the conspiracy claim, this court affirms those decisions. However, because the district court improperly determined that the non-solicitation clause was invalid and unenforceable as a matter of Virginia law, this court remands one aspect of the tortious interference with contract claim for further proceedings.

### COSTS

Each party shall bear its own costs.

<u>AFFIRMED IN PART, REVERSED IN PART, and REMANDED</u>